Filed 2/4/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KENNETH ECONOMY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SUTTER EAST BAY HOSPITALS,<br><br>    Defendant and Appellant. | A150211, A150738, A150962<br><br>(Alameda County<br>Super. Ct. No. RG13663984) |

    May a hospital avoid its obligation to provide notice and a hearing before terminating a doctor's ability to practice in the hospital for jeopardizing patient quality of care, by directing the medical group employing the doctor to refuse to assign the doctor to the hospital? We agree with the trial court that it may not, and that it will be liable for damages when it causes such a termination without complying with statutorily mandated procedures.

    Defendants Sutter East Bay Hospitals and Alta Bates Summit Medical Center (collectively, the hospital) appeal a judgment awarding plaintiff Dr. Kenneth Economy substantial damages based on the suspension and later termination of his "staff privileges, membership, or employment" with the hospital. The termination was "based on a medical disciplinary cause or reason" without prior notice and a hearing in violation of Business and Professions Code[1] section 809 et seq. The hospital contends the court erred in concluding that plaintiff was entitled to notice and a hearing prior to his suspension and termination and, alternatively, if he was entitled to any statutory protections, he failed to

---

[1] All statutory references are to the Business and Professions Code unless otherwise noted.

establish that the hospital's failure to hold a hearing caused his damages. The hospital also challenges the inclusion of approximately $650,000 in damages to account for "tax neutralization" on the ground that the evidence in support of the award was speculative.[2] In a cross-appeal, plaintiff contends the court erred in denying his motion for attorney fees and costs under section 809.9. We find no error and shall affirm the judgment in full.

## Background

The factual background is undisputed in most material respects. Plaintiff is an anesthesiologist who practiced at the hospital from 1991 until his termination in 2011. The hospital operates "closed" anesthesia departments pursuant to a contract with the East Bay Anesthesiology Medical Group (East Bay Group).[3] Under the terms of the contract, the hospital retained East Bay Group "to provide administrative and coverage services to develop and operate" various anesthesiology departments in the hospital. The East Bay Group's coverage responsibilities include, among others, hiring qualified physicians and providing a schedule under which physicians staff the departments. Every anesthesiologist that provides services at the hospital is required to be employed by East

---

[2] Dignity Health and Memorial Health have filed an amicus curiae brief in support of the hospital arguing that before filing an action for damages, plaintiff was required to petition for a writ of mandate to compel the hospital to provide a peer review hearing. The trial court rejected a similar argument made by the hospital on the ground that plaintiff was not required to exhaust such an administrative remedy because the hospital did not make that remedy available to him. (*Westlake Community Hospital v. Superior Court* (1976) 17 Cal.3d 465, 478.) The hospital has not challenged this ruling on appeal and we therefore decline to consider the argument further. (*California Building Industry Assn. v. State Water Resources Control Bd*. (2018) 4 Cal.5th 1032, 1048-1049, fn. 12.) Amicus curiae's argument that plaintiff's damages should have been limited under the terms of plaintiff's employment agreement with East Bay Group is also beyond the scope of this appeal, as it was not made by the hospital in the trial court or on appeal. Amicus curiae's argument regarding causation is considered in connection with our discussion below.

[3] Hospitals often enter into closed or "exclusive contracts . . . with healthcare entity-based physicians such as pathologists, radiologists, and anesthesiologists, . . . for a variety of reasons including: (1) improving the efficiency of the healthcare entity; (2) standardization of procedures; (3) securing greater patient satisfaction; (4) assuring the availability of specific services; (5) cost containment; and (6) improving the quality of care." (1 Health Law Practice Guide (2018) Exclusive Contracts, § 2:24.)

Bay Group. The contract requires that all physicians hired by the group be "a member in good standing of hospital's medical staff, with active and unrestricted medical staff privileges" and that East Bay Group notify the hospital immediately if any physician fails to meet the required professional qualifications. East Bay Group's administrative responsibilities include, among others, appointing a physician as a medical director to provide day-to-day administrative services to each department and to "participate in the hospital's peer review process as appropriate or as requested by the hospital or the medical staff." In addition, the medical directors are required to "develop and maintain an independent peer review process, which is administered by the group, for physicians that provide services under this agreement." Section 4.2, subdivision (c) of article IV of the agreement authorizes the hospital to require East Bay Group to immediately remove from the schedule any physician providing services under the agreement who, among other things, "[p]erforms an act or omission that jeopardizes the quality of care provided to hospital's patients."

In July 2011, the California Department of Public Health conducted an unannounced "medication error reduction plan" survey at the hospital to determine its compliance with state law. The surveyor found that plaintiff was responsible for numerous deficiencies regarding the use of the drug droperidol and that the deficiencies "placed patients at risk for undue adverse medical consequences." Accordingly, the surveyor declared that the hospital was in "immediate jeopardy" until a written plan correcting the violations was prepared and accepted.[4]

The hospital's administrators quickly formed a response team and contacted the anesthesia department medical director, Dr. Marc Schroeder. Because Schroeder was on vacation, he referred the inquiry to Dr. John Donovan, East Bay Group's president, designating Donovan to act as his representative.

---

[4] "Immediate jeopardy" determinations are rare; they require an immediate response from a hospital's administration; and they typically carry a regulatory fine. The trial court found that the "immediate jeopardy" finding was an "emergency situation" for the hospital.

3

Donovan met with the hospital's response team, including Dr. Steven O'Brien, the hospital's vice president of medical affairs. O'Brien asked and Donovan agreed to remove plaintiff from the anesthesia schedule pending further investigation. Thereafter, Donovan met with plaintiff and advised him that he was being taken "off the schedule" based on his "use of droperidol," and told him that he would have no further duties until after Donovan had discussed the issue with others.

The action plan adopted by the hospital indicated that "the physician who had the overwhelming utilization of droperidol and in several cases did not follow the hospital policy on droperidol use, was referred to peer review and was suspended from active practice by his group pending further investigation." The state surveyor approved the action plan and lifted the "immediate jeopardy" declaration.

In the weeks following, the hospital's anesthesia department peer review committee met, discussed, and approved a recommendation that plaintiff complete a continuing education course through the Physician Assessment and Clinical Education (PACE) program at the University of California, San Diego. The committee also recommended that plaintiff's "return to clinical practice" be "dependent upon documented completion of phase I and phase II of the PACE program as well as completion of any recommendations made by that program and the peer review committee."

The president of the hospital's medical staff forwarded the recommendation to Donovan and requested that East Bay Group implement the recommendation. The president's memorandum to Donovan states that the medical staff leadership "will monitor the situation, and reserves the right to take action pursuant to the medical staff bylaws, at any time, if deemed reasonable and warranted to protect the interests of patients." (*Ibid*.)

When plaintiff was informed that he "needed to go through the PACE program and pass parts I and II before [he] would be returned to Summit Hospital," he asked if he could appear before "the peer review body" to discuss those requirements. He was told that PACE was his only alternative and that the medical executive committee was "aware

4

of [plaintiff's] situation and they would not look kindly on [him] appearing before them." Plaintiff then completed the PACE program and returned to work at the hospital on November 4, 2011.

On November 10, O'Brien asked a hospital pharmacy manager to review plaintiff's charts and ensure "that documentation was okay." The pharmacy manager reported that in "2 of the 4 records" he had reviewed, plaintiff "failed to use the leading zero that was required by the hospital's policy."[5] O'Brien immediately advised Donovan and Schroeder that the pharmacist's report was "completely unacceptable for this doctor after such extensive 'training' " and asked them to "address this immediately and let me know the outcome." Donovan advised plaintiff that he was "off the [anesthesia] schedule until we figure things out."

In subsequent communications between the hospital and East Bay Group, O'Brien informed Donovan that the hospital was "not comfortable with the quality of care provided by [plaintiff] and cannot approve anesthesia coverage schedules containing" him. Donovan confirmed with O'Brien that the hospital was "asking [East Bay Group] to remove [plaintiff] under" the provision of the hospital's contract with East Bay Group that "allows the hospital to remove any physician that " 'performs an act or omission that jeopardizes the quality of care provided to Hospital patients.' "

On November 20, Donovan advised plaintiff that the hospital administration was "unhappy with [his] errors" and did not want him returned to the anesthesia schedule. He told plaintiff he could resign his employment with East Bay Group, but if he declined, Donovan "would move forward with termination." Plaintiff refused to resign, and following a vote by the shareholders of the East Bay Group, plaintiff's employment was terminated.

---

[5] According to evidence at trial, the use of a "leading zero" means "put[ting] a zero before a decimal point and not leav[ing] a decimal point without a zero in front of it." According to the state surveyor, this practice ensures "there's not a tenfold error, a decimal error" in administering medication.

Thereafter, plaintiff filed a complaint against the hospital alleging causes of action for violation of his right to notice and a hearing under section 809 and his common-law right to fair procedure, as well as related causes of action for aiding and abetting and conspiracy.[6]

Following a court trial, judgment was entered in favor of plaintiff. The court found that "the action taken by [the hospital] in removing plaintiff from the anesthesia schedule in July and November 2011, which on each occasion was indisputably for a medical disciplinary cause or reason. . . , constituted a summary suspension of plaintiff's right to exercise his privileges and use the facilities of the hospital, and could only be lawfully undertaken through a formal peer review and appeal procedure as required by sections 805 and 809 . . . . The failure by [the hospital] to provide notice to plaintiff of the charges against him and the right to a hearing constituted a violation of . . . section 809.5." The court awarded plaintiff $3,867,122 in damages, including $650,910 for "tax neutralization."

The hospital timely filed a notice of appeal and plaintiff timely filed his notice of cross-appeal.

**Discussion**

**I.     The Hospital's Appeal**

1. *The hospital violated plaintiff's rights by suspending his hospital privileges without providing the required notice and hearing.*

California common law has long recognized a hospital's duty to provide certain protections to a physician in proceedings regarding staff privileges. In *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 815, the court held that "a physician may neither be refused admission to, nor expelled from, the staff of a hospital, whether public or private, in the absence of a procedure comporting with the minimum common

---

[6] Additional causes of action for intentional interference with prospective economic advantage and interference with his right to practice his profession were resolved against plaintiff on summary judgment. Plaintiff's complaint also alleged numerous causes of action against East Bay Group that were settled prior to trial.

6

law requirements of procedural due process." Due process in this context requires, at a minimum, that a physician be afforded, among other rights, "a hearing before the deciding board"; "a written statement of the charges against him"; and "the right to call his own witnesses." (*Id.* at pp. 815-816, fn. 12.)

"The Legislature subsequently codified the common law fair procedure doctrine in the hospital peer review context by enacting . . . sections 809 to 809.8 in 1989. [Citations.] This legislation—passed in response to the federal Health Care Quality Improvement Act of 1986 (42 U.S.C. §§ 11101-11152), which provides immunity from money damages for peer review actions taken in compliance with the statute's requirements—established the minimum procedures that hospitals must employ in certain peer review proceedings. [Citations.] . . . [T]he 'primary purpose of the peer review process' codified in this legislation is 'to protect the health and welfare of the people of California by excluding through the peer review mechanism "those healing arts practitioners who provide substandard care or who engage in professional misconduct." ' [Citation.] A second purpose of the legislation, which is 'also if not equally important, is to protect competent practitioners from being barred from practice for arbitrary or discriminatory reasons.' [¶] Thus, the peer review statute, like the common law fair procedure doctrine that preceded it, 'establishes minimum protections for physicians subject to adverse action in the peer review system.' " (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 988.)

Section 805 requires that a report be filed with the applicable licensing agency when "[a] licentiate's membership, staff privileges, or employment is terminated or revoked for a medical disciplinary cause or reason" or "[r]estrictions are imposed . . . on staff privileges, membership, or employment for a cumulative total of 30 days or more for any 12-month period, for a medical disciplinary cause or reason." (§ 805, subd. (b)(2), (3).) " 'Medical disciplinary cause or reason' means that aspect of a licentiate's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (§ 805, subd. (a)(6).) As relevant here, section 809.1, subdivision (a) provides: "A licentiate who is the subject of a final proposed action

7

of a peer review body for which a report is required to be filed under Section 805 shall be entitled to written notice as set forth in subdivisions (b) and (c)." Subdivision (b) requires, among other things, that the licentiate be advised of the right to request a hearing on the final proposed action.[7] Section 809.6, subdivision (c) provides that the provisions of section 809.1 "may not be waived in ['any applicable agreement or contract between the licentiate and . . . health care entity'] for a final proposed action for which a report is required to be filed under Section 805."

Under California law, a hospital's medical staff is required to adopt written bylaws that establish formal procedures for evaluating "staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate." (Cal. Code Regs., tit. 22, § 70703, subd. (b).) The medical staff also must provide a means for enforcing its bylaws, including adoption of a peer review process, which is subject to the minimum procedural standards set by the above statutes. (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1482; §§ 809-809.9 [minimum procedural standards for peer review proceedings].) To comply with these requirements, article VIII, section 8.1(F) of the hospital's medical staff bylaws provides, "any one of the following adverse actions or recommended actions shall be deemed grounds for a hearing: [¶] . . . [¶] 3. Revocation or reduction of clinical privileges, based on professional competence or conduct which affects or could affect adversely the health or welfare of a patient or patients; [¶] . . . [¶] 5. Suspension of . . . clinical privileges for more than fourteen (14) days based on professional competence or conduct which affects or could affect adversely the health or welfare of a patient or patients; and [¶] 6. Any other disciplinary action or recommendation that must be reported, by law, to the Medical Board of California." The purpose of the "hearing and appellate review proceedings" is, among others, "to provide for a fair review of decisions that adversely affect

---

[7] Sections 809.2 through 809.4 govern the rights of parties at the hearing.

practitioners" and "to establish flexible procedures which do not create burdens that will discourage the medical staff and board of directors from carrying out peer review."

The hospital does not dispute that if its medical executive committee had directly revoked or reduced plaintiff's clinical privileges, plaintiff would have been entitled to the due process protections provided by its medical staff bylaws and section 809. The hospital contends that plaintiff's statutory notice and hearing rights were never triggered because he was terminated by East Bay Group, his employer, and not by the hospital. The hospital argues that East Bay Group made the decision to suspend and then terminate plaintiff's employment; the suspension and termination did not trigger a duty to file a report with the state licensing board because the East Bay Group is not a "peer review body" as defined by the statute;[8] and that plaintiff's redress for any grievance related to the discipline and dismissal imposed by East Bay Group must be directed to East Bay Group, the entity responsible for those employment actions.

The trial court rejected these arguments, finding that under the hospital's approach "a hospital could effectively avoid complying with the notice and hearing requirements of sections 805 and 809 by simply relying on its contracts with third-party employers as a way to terminate the services of physicians whenever a hospital administrator determines there is a medical disciplinary reason." We agree that the hospital's position is untenable. If accepted, plaintiff's right to practice medicine would be substantially restricted without due process and, despite the hospital's concern that plaintiff was endangering patient safety, the state licensing board would never be notified.

The determination by the hospital that it would not approve an anesthesia coverage schedule on which plaintiff was included effectively directed East Bay Group to remove plaintiff from all schedules, as it had a right to do under section 4.2, subdivision (c) of its

---

[8] Section 805, subdivision (a) defines a "peer review body" to include, among other obviously inapplicable groups, "A medical or professional staff of any health care facility or clinic licensed under Division 2 (commencing with Section 1200) of the Health and Safety code or of a facility certified to participate in the federal Medicare Program as an ambulatory surgical center."

contract with East Bay Group. Its "request" that plaintiff be removed from the hospital's anesthesiology schedules, first temporarily and later permanently, necessarily resulted in a substantial reduction of plaintiff's staff privileges. The request was the functional equivalent of a decision to suspend and later revoke plaintiff's clinical privileges.

As the trial court explained, the hospital's argument that plaintiff's "privileges were not affected by its actions because he still had his privileges 'on paper' . . . is based on a limited and unjustified view of the meaning of 'privileges' which overlooks the breadth of the statutory definition of the term as well as California Supreme Court jurisprudence involving adverse actions impacting a physician's right to use hospital facilities." Section 805, subdivision (a)(4), defines "staff privileges" as "any arrangement under which a licentiate is allowed to practice in or provide care for patients in a health facility," including "full staff privileges, active staff privileges, limited staff privileges, auxiliary staff privileges, provisional staff privileges, temporary staff privileges, courtesy staff privileges, locum tenens arrangements, and contractual arrangements to provide professional services, including, but not limited to, arrangements to provide outpatient services." Under subdivision (a)(5), the " '[d]enial or termination of staff privileges, membership, or employment' includes failure or refusal to renew a contract or to renew, extend, or reestablish any staff privileges, if the action is based on medical disciplinary cause or reason." Moreover, a physician retains a common law right to fair procedure where the hospital's act significantly impairs the physician's practice of medicine. (*Potvin v. Metropolitan Life Ins. Co*. (2000) 22 Cal.4th 1060, 1072-1073.) Because the terms of the contract between the hospital and East Bay Group prohibited anesthesiologists from performing services at the hospital if not employed and scheduled by East Bay Group, the hospital's decision not to accept any schedule on which plaintiff was included effectively prevented plaintiff from exercising clinical privileges at the hospital and engaging in the practice of medicine. This was a decision that under the hospital's medical staff bylaws could be made only by the medical executive committee after notice and opportunity for a hearing before its peer review committee (designated in the bylaws as the "hearing committee"). And the medical executive committee could not

make such a decision, requiring the filing of a report under section 805, without first complying with the notice and hearing requirements of section 809.

The hospital admittedly did not provide notice or a hearing. The hospital does not, and cannot, claim that the review conducted by the anesthesiologist department's peer review committee was sufficient. Under the hospital's medical staff bylaws, the only entity with the ability to restrict or terminate plaintiff's medical staff privileges was the medical executive committee and it is undisputed that this committee failed to act in this instance. Contrary to the hospital's argument, the trial court's conclusion does not impute to the hospital actions subsequently taken by East Bay Group but holds the hospital responsible for its own actions and failures to act.

Nor can the hospital establish that it delegated its duties to East Bay Group under section 1.13 of exhibit 1.2(c) to the contract, which requires East Bay Group to develop and maintain an independent peer review process for its physicians. As the trial court concluded, the language in the agreement does not clearly state that the East Bay Group peer review committee "is responsible for protecting the full panoply of rights guaranteed physicians under sections 805 and 809." Nothing in the medical staff bylaws requires or authorizes a closed department to conduct peer review in lieu of the procedures described in the bylaws. Moreover, as the trial court also noted, there is no evidence that East Bay Group had any policies or procedures for the conduct of peer review, which according to the hospital's expert, would be required if a closed department were responsible for peer review. In contrast, section 809.05 makes clear that review of physician performance is committed to a hospital's medical staff. (*Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1267 ["Every licensed hospital is required to have an organized medical staff responsible for the adequacy and quality of the medical care rendered to patients in the hospital."].)

Likewise, section 4.4 of the hospital's agreement with East Bay Group, which permits termination of the agreement without a hearing before a committee of the

medical staff and without affecting staff privileges,[9] applies only to the termination of medical privileges as a result of administrative/quasi-legislative decisions by the hospital, rather than adjudicatory/quasi-judicial decisions about a physician's competency. (See *Mateo-Woodburn v. Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1183 [due process does not require a peer review hearing where termination of privileges was the result of administrative decision by hospital to restructure department]; *Abrams v. St. John's Hospital & Health Center* (1994) 25 Cal.App.4th 628, 639 [individual physician, who contracted with a hospital to supply exclusive medical services, is bound by the express waiver of due process hearing rights otherwise afforded him or her under the Business and Professions Code where the physician's contract was terminated for reasons unrelated to the physician's medical competency].) Moreover, section 809.6 expressly prohibits a contractual waiver of peer review proceedings in cases where a physician's medical competency is at issue.

Accordingly, the trial court properly determined that the hospital violated plaintiff's statutory and common law right to due process by substantially restricting his medical privileges without notice and a hearing.

2. *Plaintiff's lost earnings were caused by the violation of his due process rights.*

The judgment orders the hospital to pay damages in the following amounts: $1,136,906 in lost income, $1,159,354 in future lost income, $650,910 for tax neutralization, $19,000 for the cost of the PACE program, $650,000 for emotional distress and $250,952 in prejudgment interest.

The hospital contends the judgment must be reversed because there is no substantial evidence to support the trial court's finding that the hospital's failure to

---

[9] Section 4.4 of the hospital agreement provides: "Continuation of this agreement is not a condition of medical staff membership. Therefore, this agreement may be terminated in accordance with this section 4 without the necessity of a hearing before the hospital's board of directors, a committee of the medical staff, or any other body. Group represents and warrants that all physicians providing administrative services or coverage services under this agreement are aware of and accept this condition."

provide notice and a hearing caused plaintiff's damages. The hospital argues plaintiff is not entitled to lost wages because "there was absolutely no evidence below to support the conclusion that plaintiff would have been exonerated at the hearing and would have continued to work at the hospital." The trial court rejected the hospital's argument that plaintiff was required to prove that he would have prevailed had a peer review hearing been held. The court explained, "The quality of plaintiff's care was not at issue in this litigation. [The hospital] failed to provide plaintiff with notice of the charges against him or of his right to a hearing before his peers. What the charges would have been and what might have occurred had peer review been made available to plaintiff, is pure conjecture. Having denied any responsibility for providing plaintiff with the opportunity for a hearing in connection with the summary suspension of plaintiff's privileges in July and November 2011, [the hospital] cannot avoid liability for its tortious conduct by claiming that plaintiff must now establish that he would have prevailed had a peer review proceeding actually occurred."

Although neither party cites authority addressing the appropriate remedy for the termination of hospital privileges without the requisite notice and hearing, analogous caselaw establishes that a plaintiff is entitled to recover lost wages until the due process violation has been corrected. In *Barber v. State Personnel Bd*. (1976) 18 Cal.3d 395, 402, the court held that the appropriate remedy when a permanent civil service employee is denied a *Skelly*[10] hearing prior to termination "is to award back pay for the period of wrongful discipline." (*Id*. at p. 402.) The court explained, "The constitutional infirmity of the disciplinary procedures used in the present case was the imposition of discipline prior to affording the employee notice of the reasons for the punitive action and an opportunity

---

[10] In *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 206, the court held that the California civil service employment scheme confers upon permanent employees "a property interest in the continuation of [their] employment which is protected by due process." A physician's hospital privileges also constitute a property right that cannot be terminated absent a showing of adequate cause in a proceeding consistent with minimal due process requirements. (*Anton v. San Antonio Community Hospital, supra,* 19 Cal.3d at pp. 824-825.)

13

to respond. [Citation.] This infirmity is not corrected until the employee has been given an opportunity to present his arguments to the authority initially imposing discipline. [Citation.] Under the procedures applied to [the] plaintiff, the constitutional vice existed until the time the board rendered its decision. Prior to that time, the discipline imposed was invalid." (*Id*. at p. 403.) While the court went on to conclude that the termination ultimately was not wrongful (*id*. at p. 404), plaintiff was nonetheless entitled to back pay from the time of his dismissal to the date the State Personnel Board's decision was filed (*id*. at p. 405).

*Barber* makes clear that whether the employer had a legitimate basis to terminate the employee's employment and whether the employee is entitled to reinstatement are questions entirely distinct from whether the employee is entitled to back pay for the period during which the discipline was invalid. *Barber* establishes without caveat that the employee is entitled to "back pay for the period of wrongful discipline" (*Barber v. State Personnel Board*, *supra*, 18 Cal.3d at p. 402); what makes the discipline "wrongful" has nothing to do with whether the employer had a legitimate basis for terminating the employment. The discipline was wrongful solely because it was imposed in violation of the employee's right to due process.

Similarly, in this case the judgment does not depend on whether plaintiff ultimately would have prevailed at a peer review hearing. Even if plaintiff would not have prevailed, he is entitled to back pay for the period during which the discipline was invalid. There is no potential for endless and unlimited liability because of plaintiff's duty to mitigate his losses.

*Ascherman v. San Francisco Medical Society* (1974) 39 Cal.App.3d 623, cited by the hospital, is distinguishable. In that case, the physician sought an injunction and damages in an action against various hospitals and others for conspiring to interfere with his practice of medicine. (*Id*. at pp. 629-630.) The physician's complaint alleged that in furtherance of the conspiracy, the hospitals had terminated his hospital privileges without providing notice and a hearing as required by the Medical Staff Bylaws. (*Id*. at pp. 631-632.) The court held that plaintiff could recover damages in addition to equitable relief

14

for the denial of his right to a hearing. (*Id*. at pp. 650-651.) The court also observed, however, that "public interest indicates that if the plaintiff should have been excluded, he should not be awarded damages because the hospital defendants acted for improper motives." (*Id*. at p. 664.) In that case the defendants had presented evidence to establish that plaintiff's privileges would have been terminated had a hearing been held. (*Id*. at pp. 663-664.) The court was, at most, recognizing an affirmative defense to plaintiff's claim. Here, the hospital presented no evidence to establish that plaintiff would not have prevailed had he been provided a hearing before imposing the corrective action deemed appropriate.[11]

3. *The court did not err in awarding an additional amount of damages intended to offset the tax consequences of a lump sum award for lost earnings.*

The only element of the damages awarded plaintiff that the hospital specifically challenges is the $650,910 for tax neutralization. This amount was calculated "to offset the increased tax burden on plaintiff resulting from a lump sum award of damages as compared to what plaintiff would have owed in taxes if the earnings had been received sequentially each year." The amount was based on testimony by plaintiff's expert, economist Dr. Barry Ben-Zion.

Prior to trial, the court denied the hospital's in limine motion to exclude the expert's testimony on the grounds that it does not meet the requirements of the *Kelly-Frye*[12] test for admissibility of scientific evidence, or of Evidence Code sections 801 and

---

[11] The hospital's reliance on *Viner v. Sweet* (2003) 30 Cal.4th 1232 is also misplaced. In that case, the court held that the standard of "but for" causation, requiring the client of an attorney to prove that the negligence of the attorney was a substantial factor in causing the client's damage, applied equally to transactional and litigation malpractice actions. The court explained that "[t]he purpose of [the] requirement . . . is to safeguard against speculative and conjectural claims. [Citation.] It serves the essential purpose of ensuring that damages awarded for the attorney's malpractice actually have been caused by the malpractice." (*Id*. at p. 1241.) Here, it is not speculative to conclude that plaintiff's lost wages were caused by the unlawful termination of his hospital privileges.

[12] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

802 because it is highly speculative and based on information not reasonably relied upon by experts. On appeal, the hospital renews its arguments that the expert's calculations are "based on speculative assumptions about future tax rates remaining constant and the nature of plaintiff's future tax returns and income" that "should never have been admitted in the first place and do not constitute substantial evidence."

As the trial court noted with respect to the admissibility of the expert's testimony, "while there are no reported decisions in California on the concept of tax neutralization, the concept has been endorsed by . . . federal appellate courts." (See *Equal Employment Opportunity Commission v. Northern Star Hospitality, Inc*. (7th Cir. 2015) 777 F.3d 898; *Eshelman v. Agere Systems, Inc*. (3d Cir. 2009) 554 F.3d 426; *Sears v. Atchison, Topeka & Santa Fe* (10th Cir. 1984) 749 F.2d 1451; *Clemens v. CenturyLink Inc*. (9th Cir. 2017) 874 F.3d 1113, 1117.) The court noted further that "[t]he concept of compensating a plaintiff for the additional tax liability on a lump-sum payment is also consistent with Civil Code section 3333, which provides that the measure of damages in a case such as this is 'the amount which will compensate for all the detriment proximately caused' by the wrongful conduct."

The federal authorities permit, but do not require, the trial court to adjust a "lump-sum back-pay award to account for the corresponding increase in [] tax liability." (*Clemens v. CenturyLink Inc*., *supra*, 874 F.3d at pp. 1114-1415.) The courts explain that insofar as a lump-sum award will "push a plaintiff into a higher tax bracket than he would have occupied had he received his pay incrementally over several years" the expanded tax liability "effectively denies him what Title VII promises—full relief that puts [plaintiff] where he would be had the unlawful employment discrimination never occurred." (*Id*. at p. 1116.) The hospital does not assert that there is anything inherently speculative about calculating the income-tax disparity for back pay—that is, for compensation lost prior to the determination of liability. We discern no possible reason to disregard the tax neutralization factor with respect to back pay.

Although an award to compensate for an income-tax disparity for lost future wages is inherently speculative, as is any award for lost future income, we see no reason

16

why this factor cannot be established with sufficient certainty. As the trial court noted, plaintiff's expert provided "detailed testimony regarding his calculations of (i) plaintiff's total tax liability had plaintiff not been terminated and had he continued to earn income, (ii) the amount plaintiff would have to pay in taxes if awarded the computed loss of earnings (back and front pay), and (iii) the tax neutralization amount, i.e., the amount of money needed to generate a net amount equal to the adverse tax consequence." We agree with the trial court that the foundational information relied on by the expert, including the applicable tax rates, provided a reasonable basis for his opinions.

The hospital's reliance on *Canavin v. Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512 is misplaced. In that case, that court held that in a wrongful death action it is "error to compute a survivor's lost support based upon the decedent's projected *net* income which would have been available for support except for the wrongful death." (*Id.* at p. 522, italics added.) The court explained, "Numerous California decisions as well as rulings of the courts of other jurisdictions exclude income tax projections from the jury's consideration." (*Id.* at p. 539 (conc. & dis. opn. of Staniforth, J. & Brown, J.).) This is because, among other reasons, "tax consequences are collateral, speculative and conjectural." (*Id.* at p. 541.) In that case, however, the court was concerned with reducing the amount of damages to account for the income taxes that might otherwise have been paid in the future. (See *id.* at p. 542 [A "negligent defendant should not benefit by the fortuitous event the person injured may be subject (or not subject), in a totally unknown and unpredictable amount, to income tax."].) In contrast, the purpose of the award in the present case is to ensure that plaintiff is fully compensated for his losses. We agree that the expert here laid a sufficient foundation to establish the probability and reasonableness of the tax neutrality projections to justify reliance on those projections.

## II.    Plaintiff's Cross-appeal

Section 809.9 requires the court to award attorney fees "to a substantially prevailing party" in an action "brought to challenge an action taken or a restriction imposed which is required to be reported pursuant to Section 805 . . . if the other party's conduct in bringing, defending, or litigating the suit was frivolous, unreasonable, without

foundation, or in bad faith." In *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 30, the court concluded that "an award of attorney fees to a substantially prevailing party is required if any one of the four grounds listed is shown." The court held that the term "without foundation" as used in this statue "refers to both the factual and the legal bases for the positions taken by a party" and means "baseless, groundless, or without support." (*Id.* at pp. 30-31.) In determining whether the losing party's conduct was unreasonable, the court conducted "an independent review and appl[ied] the any-reasonable-attorney standard as a matter of law." (*Id.* at p. 32.) The court concluded that the losing party's conduct was frivolous "if any reasonable attorney would agree it is completely without merit in the sense that it lacks legal grounds, lacks an evidentiary showing, or involves an unreasonable delay." (*Id.* at p. 33.) Finally, the court adopted a subjective test for bad faith, holding that "conduct is improperly motivated for purposes of a bad faith standard under section 809.9 if it involves actual malice, ill will, or a purpose not related to the legitimate functioning of the hospital and its staff." (*Id.* at p. 35.)

Here, the trial court found that although plaintiff was the prevailing party, the hospital's conduct in defending the action was not frivolous, unreasonable, without foundation, or in bad faith. The court explained that the hospital's defense, taken as a whole, was not "so completely lacking in objective merit that no reasonable attorney would have thought [the hospital's] defense to be tenable." The court explained, the hospital's "defense was based on the fact that it did not provide peer review to plaintiff, and thus, was not required to comply with the procedure governing peer review. [The hospital] argues plaintiff was employed by [East Bay Group], and its administrative staff asked [East Bay Group] to remove plaintiff from the schedule and to terminate plaintiff's membership in [East Bay Group] as allowed under its contract . . . . Although there was some inconsistency with regard to the evidence about whether [the hospital, East Bay Group], or both were responsible for the decision to suspend and terminate plaintiff's services, [the hospital's] factual assertions were supported by the evidence, for the most part, and its legal contention that there is no requirement to prepare an 805 report in the

18

absence of peer review had some support. [¶] [The hospital's] defense failed because the contractual arrangement between [the hospital] and [East Bay Group] created a situation in which plaintiff could be removed for a medical disciplinary reason from the anesthesiology schedule, effectively resulting in suspension or terminations, without peer review. The court ruled that result was contrary to public policy. . . . The legal issue at the center of this case was difficult, and the conclusion that [the hospital] could not rely on its agreement with [East Bay Group], based on the public policy underlying the statutory provisions governing peer review, is arguable." The court went on to reject plaintiff's argument that the hospital's defense of this action was motivated by subjective bad faith.

Plaintiff contends the trial court erred in finding that the hospital's conduct did not rise to the level of frivolous, unreasonable, without foundation, or in bad faith. The parties dispute whether this court should apply a de novo standard or review the trial court's decision for substantial evidence. With respect to this issue, the standard of review is of no consequence. The denial of the motion for attorney fees withstands scrutiny under either standard. Based on the record before us, we cannot say that the hospital's defense of the litigation was frivolous, unreasonable, without foundation, or in bad faith.

## Disposition

The judgment is affirmed. Plaintiff shall recover his costs on appeal.


POLLAK, P. J.

WE CONCUR:

TUCHER, J.
BROWN, J.

19

Trial court:                                    Alameda County Superior Court

Trial judge:                                    Honorable Ronni B. MacLaren

Counsel for plaintiff and appellant            Law Offices of Victor C. Thuesen
Kenneth Economy:                               Victor Clark Thuesen

                                               Weinberg Hoffman, LLP
                                               Ivan Weinberg

Counsel for defendant and appellant            Hanson Bridgett LLP
Sutter East Bay Hospitals:                     Glenda M. Zarbock
                                               Jullian Somers Donovan

                                               Greines, Martin, Stein & Richland
                                               Kent L. Richland

                                               Manatt, Phelps & Phillips, LLP
                                               Barry S. Landsberg
                                               Doreen W. Shenfeld
                                               Joanna S. Mccallum
                                               Dignity Health and Memorial Health Services as
                                               amicus curiae on behalf of Sutter East Bay Hospitals

A150211, A150738, A150962