Filed 3/29/24; Certified for Publication 4/25/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RYAN KIME,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>DIGNITY HEALTH, INC.,<br><br>     Defendant and Respondent. | A166748<br><br>(San Francisco County<br>Super. Ct. No. CGC20586388) |

Dr. Ryan Kime was the subject of a disciplinary proceeding by the Medical Board of California, which resulted in a public reprimand. While that proceeding was ongoing, Kime applied for privileges in the emergency department of two hospitals owned by Dignity Health, Inc. (Dignity). The hospitals stopped processing Kime's application a few days after the effective date of the reprimand, and Kime subsequently sued Dignity for injunctive relief and damages, alleging that Dignity violated his common law and statutory rights by denying his application without offering him a hearing.

Dignity moved for summary judgment, or in the alternative, summary adjudication, arguing among other things that it had established a policy that it would not consider applicants with disciplinary histories for emergency department privileges, and that no hearing is required when privileges are denied because of the implementation of such a policy. Simultaneously, Kime

1

moved for summary adjudication on the issue of Dignity's duty to provide notice and a hearing after denying his application.

The trial court granted Dignity's motion for summary judgment and denied as moot Kime's motion for summary adjudication. Kime now appeals from the resulting judgment, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts of this case are largely undisputed, although the parties disagree as to their legal significance.

A.      *Kime's Background as an Emergency Medicine Physician*

Kime is an emergency medicine physician, whose medical staff membership and privileges at St. Helena Clearlake Hospital (Clearlake Hospital) were summarily suspended on August 7, 2015. In September 2015, Clearlake Hospital filed a report pursuant to section 805 of the Business and Professions Code (the 805 Report) informing the Medical Board of California (Medical Board) that Kime had resigned his privileges while under investigation for having been summarily suspended.[1]

Subsequently, in February 2017, the Medical Board filed an accusation against Kime alleging that on August 7, 2015, after a forest fire caused a power failure at Clearlake Hospital and Kime was informed that the hospital

---

[1] The Business and Professions Code requires the filing of a report with the Medical Board within 15 days of a physician resigning from staff membership or privileges "after receiving notice of a pending investigation initiated for a medical disciplinary cause or reason." (Bus. & Prof. Code, § 805, subd. (c).) " 'Medical disciplinary cause or reason' " is defined to mean "that aspect of a [physician's] competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care." (*Id.*, subd. (a)(6).) The parties agree that Kime was summarily suspended from the Clearlake Hospital medical staff for a medical disciplinary cause or reason within the meaning of section 805.

2

would not go "on diversion," Kime unilaterally diverted a patient who arrived at the emergency room without a medical screening, failed to provide care for other patients in the emergency department, and "flipped off" the remaining emergency department staff at the end of his shift.

On January 26, 2018, Kime executed a stipulated settlement and disciplinary order (settlement) to resolve the accusation, and the California Attorney General endorsed the stipulation for consideration by the Medical Board. Kime does not dispute that in the settlement he admitted that he unilaterally diverted a patient without performing a medical screening and that he made an "inappropriate gesture" to a nurse. The Medical Board adopted the settlement on March 29, 2018, with an effective date of April 27, 2018.

After the incident at Clearlake Hospital, Kime contends he applied unsuccessfully for hundreds of other positions, including as a member of the medical staff at other hospitals.[2]

B.   *The Emergency Department Services Agreement at Dignity's
       Mercy Hospitals*

Meanwhile, Dignity and Valley Emergency Physicians entered into an Emergency Department Services Agreement (Agreement), effective December 1, 2017. Under the Agreement, Valley Emergency Physicians became the exclusive provider of Emergency Department physician services for two Dignity hospitals in Bakersfield: Mercy Hospital and Mercy Southwest Hospital (collectively, Mercy). The Agreement refers to Valley Emergency

---

[2] In a deposition, Kime testified, "Usually, in the screening process, they ask for suspensions. So, obviously, I would answer honestly, and they would say that would preclude you from this job is typically how it would go."

3

Physicians as "Group," and the physicians who provide Emergency Department Services at Mercy as "Group Providers."

The parties focus on section 3.13 of the Agreement (section 3.13), which provides: "Group represents and warrants that, to the best of Group's knowledge, after reasonable investigation, except as set forth in Exhibit 3.13: . . . (b) [no] Group Provider has ever been reprimanded, sanctioned or disciplined by any licensing board, certifying authority or medical specialty board; . . . (e) no Group Provider's medical staff membership or clinical privileges at any hospital or health care facility have ever been suspended, limited or revoked for a medical disciplinary cause or reason." Exhibit 3.13, entitled "Exceptions to Representations and Warranties of Group," says "None."

Dignity characterizes section 3.13 as establishing threshold "eligibility requirements" under the Agreement, such that physicians whose privileges have been suspended for a medical disciplinary cause are ineligible for Emergency Department privileges, and Valley Emergency Physicians violates the Agreement if it submits applications to Dignity for physicians with certain disciplinary histories.

Kime, on the other hand, characterizes section 3.13 as establishing "disclosure requirements" that merely require Valley Emergency Physicians to inform Dignity of the existence of Group Providers' disciplinary histories.

C.    *Kime's Application for Appointment to Mercy's Staff*

On December 14, 2017, after the Medical Board's accusation against Kime had been filed, but before the settlement was executed and the accusation was resolved, Valley Emergency Physicians offered Kime a position as an emergency room physician at Mercy. The offer was

4

conditioned upon Kime successfully applying for and being appointed to the Mercy medical staff and being granted clinical practice privileges at Mercy.

Mercy's Medical Staff Bylaws require a candidate seeking appointment to the medical staff to apply to Mercy's medical staff office. Mercy's medical staff office would determine whether an applicant had submitted all required materials, and Mercy's credential verification office would verify their authenticity. Once the required documentation was received and verified, an application would be submitted to the credentials committee of Mercy's medical staff for consideration.

On February 9, 2018, Valley Emergency Physicians submitted Kime's application for staff privileges to Mercy.[3] The application required Kime to answer certain "attestation questions" and "provide full details" to explain any "yes" answers. Kime answered "yes" to the question whether his staff privileges had ever been suspended for "possible incompetence or improper professional conduct, or breach of contract," and to the question whether his professional liability insurance had been terminated or denied, but he did not provide the required written explanations.

In early March, a credentialing coordinator at Mercy wrote to Kime requesting he provide explanations for the two "yes" answers. Supplemental materials from Kime were received at Mercy's medical staff office by April 20. Those materials included explanations that referenced a public letter of reprimand.[4] On April 27, the manager of Mercy's medical staff office learned that the public reprimand of Kime had been published.

---

[3] Subsequent dates are in 2018 unless otherwise stated.

[4] In the supplemental materials, Kime referenced the accusation and stated that the "Medical Board's executive director has agreed to resolve its [a]ccusation with a public letter of reprimand that mentions an inappropriate gesture I made." Kime did *not* disclose that the letter of reprimand also

5

Apparently, Kime's application was scheduled to be submitted to Mercy's credentials committee in early May. But on April 30, Mercy's chief medical officer, Joseph Smith, gave instructions that Mercy should stop processing Kime's application, and the medical staff office manager informed Valley Emergency Physicians of Smith's instructions, stating that the decision to stop processing the file "is based off of the multiple incidents of unprofessional behavior, which has been discovered during the verification process, along with the most recent Disciplinary Order and Public Reprimand by the Medical Board of CA."[5] So, on April 30, Mercy stopped processing Kime's application, and the application was never sent to the credentialing committee for review. Kime was not offered a hearing, and he never received medical staff privileges at Mercy.

D.   *Proceedings in the Trial Court*

Kime then sued Dignity, alleging that he should have been offered a hearing and Dignity's failure to do so violated his common law right to fair procedure and his statutory procedural rights under provisions of the

states that after a "patient had come to the Emergency Department on a gurney, and without performing a medical screening examination, [Kime] advised the paramedics that the hospital was on diversionary status and [Kime] directed that the patient be transported to another hospital."

[5] In his opening brief on appeal, Kime acknowledges that by "unprofessional behavior" the office manager was referring to Kime's " 'abandon[ing] a patient,' being summarily suspended, and making an obscene gesture to another caregiver at Clearlake [Hospital]," all of which were described in the 805 Report and subsequent settlement. Valley Emergency Physicians did not attempt to persuade Mercy to overturn its decision to stop processing Kime's application. Instead, it withdrew Kime's application from consideration for medical staff privileges.

6

Business and Professions Code.[6]  He sought an injunction requiring Dignity to grant his application for staff privileges, as well as compensatory and punitive damages, attorney fees, and costs.

Dignity eventually moved for summary judgment or alternatively summary adjudication.  At the same time, Kime moved for summary adjudication as to whether Dignity had the duty to provide him notice and a hearing after denying his application.  The trial court granted Dignity's motion, and took Kime's motion off calendar as moot.  Kime timely appealed.

## DISCUSSION

We first address whether the trial court erred in granting Dignity's motion for summary judgment.  Because we find no error, we do not reach the merits of Kime's motion for summary adjudication.

A.    *Applicable Law*

California law recognizes a physician's "common law right to fair procedure where [a] hospital's act significantly impairs the physician's practice of medicine." (*Economy v. Sutter East Bay Hospitals* (2019) 31 Cal.App.5th 1147, 1156, 1157 (*Economy*).)  The common law doctrine of fair procedure "prevent[s] the arbitrary expulsion or exclusion of individuals from private organizations that 'possess substantial power either to thwart an individual's pursuit of a lawful trade or profession, or to control the terms and conditions under which it is practiced.' " (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 87-88.)

Common law fair procedure rights do not apply, and a physician has no right to a hearing, if the physician's privileges are denied or curtailed "as a result of administrative/quasi-legislative decisions by the hospital, rather

---

[6] All statutory references are to the Business and Professions Code unless otherwise stated.

7

than adjudicatory/quasi-judicial decisions about a physician's competency." (*Economy*, *supra*, 31 Cal.App.5th at p. 1160.)  "A decision is considered quasi-legislative if it is one of general application intended to address an administrative problem as a whole and not directed at specific individuals." (*Major v. Memorial Hospitals Assn.* (1999) 71 Cal.App.4th 1380, 1398 (*Major*).)  A quasi-legislative action is the result "of the implementation of a 'policy' of the hospital," as opposed to an action "on the ground the physician has not demonstrated an ability to comply with established standards."  (*Hay v. Scripps Memorial Hospital* (1986) 183 Cal.App.3d 753, 756, 758 (*Hay*) [upholding hospital's policy decision to require a residency in obstetrics and gynecology as a prerequisite to privileges to perform certain procedures].)

The common law right to fair procedure exists alongside a statutory right set forth in the Business and Professions Code, which provides that a physician "who is the subject of a final proposed action of a peer review body for which a report is required to be filed under Section 805" is entitled to written notice of the final proposed action and the right to request a hearing. (§ 809.1, subds. (a), (b).)

Under the statutory scheme, a hospital's "medical or professional staff" is a "peer review body."  (§ 805, subd. (a)(1)(B)(i); Health & Saf. Code, § 1250, subd. (a).)  A section 805 report must be filed if, as the result of an action of a peer review body, a physician's "application for staff privileges . . . is denied or rejected for a medical disciplinary cause or reason."  (§ 805, subd. (b)(1).)

Our Supreme Court has explained the relationship between the common law and statutory rights:  "The Legislature . . . codified the common law fair procedure doctrine in the hospital peer review context by enacting Business and Professions Code sections 809 to 809.8 in 1989."  (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 988.)  The

8

legislation "established the minimum procedures that hospitals must employ in certain peer review proceedings." (*Ibid.*)  The Supreme Court further explained that "[t]he 'primary purpose of the peer review process' codified in this legislation is 'to protect the health and welfare of the people of California by excluding through the peer review mechanism "those healing arts practitioners who provide substandard care or who engage in professional misconduct" ' " and that an additional purpose of the legislation is " 'to protect competent practitioners from being barred from practice for arbitrary or discriminatory reasons.' "[7]  (*Ibid.*)

B.    *Standard of Review*

Our standard of review is well-established.  "Summary judgment is proper 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)  The moving party has the burden of persuasion that there is no triable issue of material fact and that

---

[7] The day before oral argument was held in this matter, Dignity's counsel notified us of a case that had been published that same day:  *Asiryan v. Medical Staff of Glendale Adventist Medical Center* (Feb. 29, 2024) __ Cal.App.5th __, 2024 WL 1171035 (*Asiryan*).  In *Asiryan*, the Court of Appeal held that "[i]n the hospital peer review context, the common law of fair procedure does not require additional protections beyond those in the California peer review statute," based on its conclusion that provisions in the Business and Professions Code constitute "general and comprehensive legislation, ' "indicat[ing] a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter." ' " (*Id.* at *7-8, italics omitted.)  At oral argument, the parties expressed their views as to how *Asiryan* might apply to the facts of this case, but agreed that all the briefing in this case, in the trial court and on appeal, assumed that even in the context of hospital peer review, the common law right existed alongside the statutory right.  Accordingly, we do not further address the holding of *Asiryan.*  Assuming the common law of fair procedure applies in this case, we find it was not violated.

9

the party is entitled to a judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) In ruling on the motion, the court must draw all reasonable inferences from the evidence in the light most favorable to the opposing party. (*Id.* at p. 843.) We review an order granting summary judgment de novo." (*California Taxpayers Action Network v. Taber Construction, Inc.* (2019) 42 Cal.App.5th 824, 833.)

C.    *Analysis*

In its motion for summary judgment, Dignity argued that under section 3.13 of its Agreement with Valley Emergency Physicians, Kime was not eligible for emergency department privileges at Mercy because of his disciplinary history. Dignity further argued that Kime was not entitled to a hearing because the eligibility requirements set forth in the Agreement were quasi-legislative and because the decision to stop processing Kime's application was not reportable to the Medical Board under section 805. Kime argued that section 3.13 of the Agreement did not establish eligibility requirements; instead, he argued, it "only addresse[d] whether [Valley Emergency Physicians] had 'knowledge' of whether Group Physicians had suffered from adverse actions," and provided only that if Valley Physicians had such knowledge and failed to disclose it, Dignity could terminate the Agreement. Kime argued that he was entitled to a hearing under the common law and the statute because the decision to exclude him was "discretionary" and "quasi-judicial."

1.    *The Agreement Establishes Eligibility Requirements.*

Under section 3.13 of the Agreement, Valley Emergency Physicians "represents and warrants"—that is, promises—that none of its Group Providers "has ever been reprimanded . . . by any licensing board," or had staff privileges "suspended, limited or revoked for a medical disciplinary

10

cause or reason." We conclude as a matter of contract interpretation that these representations and warranties are eligibility requirements, and that Kime's undisputed history rendered him ineligible to be a Group Provider and thus ineligible to provide emergency department services at Mercy under the Agreement.

Kime's argument that the representations and warranties establish nothing more than disclosure requirements is unpersuasive. It rests on his observation that the representations and warranties provide for the possibility of exceptions as set forth in Exhibit 3.13, entitled "Exceptions to Representations and Warranties of Group." But the possibility of exceptions is foreclosed by the language of the exhibit itself, which states, "None" in boldface type.[8]

On appeal, Kime argues for the first time that the Agreement is ambiguous. This argument has been forfeited and we do not address it. (*Archer v. Coinbase, Inc.* (2020) 53 Cal.App.5th 266, 273-274 [claim of contract ambiguity forfeited by plaintiff's failure to raise it in the trial court in opposition to summary judgment].)

2.     *The Eligibility Requirements Are Quasi-Legislative.*

There is no dispute that the Agreement establishing Valley Emergency Physicians as the exclusive provider of Emergency Department physician services for Mercy reflects Mercy's decision to operate its Emergency Department as a "closed" department. (See *Mateo-Woodburn v. Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1175 (*Mateo-Woodburn*) [hospital changed system of anesthesia services from

_____

[8] In 2022, the medical director of Valley Emergency Physicians testified at deposition, in response to questions from Kime's counsel, that no exceptions had ever been made to the requirements of section 3.13.

11

rotating " 'open staff' " to " 'closed' " system in which hospital contracted with an anesthesiologist to deliver services through arrangements with subcontracting anesthesiologists].)

A hospital's policy decision to close a department is a decision to a adopt a general rule governing the operation of the hospital, and as such lies within the hospital's quasi-legislative authority. (*Mateo-Woodburn*, *supra*, 221 Cal.App.3d at p. 1183.) A quasi-legislative decision is "not directed specifically toward the exclusion of particular physicians," but is instead "undertaken as a general effort to address an administrative problem." (*Id.* at p. 1184.) Courts view the contracting procedure by which a closed department is effected as "an integral part of the quasi-legislative decision to close the department." (*Id.* at p. 1187.) And quasi-legislative actions by hospitals are reviewed deferentially: courts will not interfere with the terms of contracts governing the operation of closed departments "unless those terms bear no rational relationship to the objects to be accomplished, i.e., if they are substantially irrational or they illegally discriminate among . . . doctors." (*Ibid.*)

Here, the exclusive services Agreement between Dignity and Valley Emergency Physicians recites that Mercy had determined that the contract was "an appropriate and effective means to" accomplish several goals, including facilitating the administration of the emergency department, ensuring that emergency services were available seven days a week, 24 hours a day, so as to "reduc[e] unnecessary delays in providing such services to Hospital patients," and "[r]educ[ing] disruptions in Hospital operations and relations between Hospital administration and the Medical Staff and among members of the Medical Staff."

12

Dignity argues that the decision to enter the Agreement with Valley Emergency Physicians was a quasi-legislative decision made to address issues related to Mercy's operation and administration, as evidenced by the Agreement's recitals, and that the eligibility requirements are quasi-legislative because they are part of the Agreement and apply to all Valley Emergency Physicians providers. (*Major*, *supra*, 71 Cal.App.4th at p. 1398; *Hay*, *supra*, 183 Cal.App.3d at p. 759.)

Kime has not come forward with any evidence to the contrary, but in his opening brief he asserts several arguments to support his claim that Dignity failed to show that the Agreement imposed quasi-legislative eligibility requirements applicable to Mercy's emergency department. Only two of these arguments are properly before us. The first is Kime's argument that no appellate court has held that a rule excluding a physician from working at a hospital due to a disciplinary history is a quasi-legislative policy. The argument is unpersuasive, because the mere fact that no court has had occasion to determine this precise issue does not mean that the adoption of such a rule is necessarily not quasi-legislative.

The second is his argument that it would be a violation of public policy for a quasi-legislative rule to bar a physician from medical staff privileges based solely on the physician's disciplinary history because that would contravene the Legislature's "decision to codify physicians' right to fair procedures following the denial of privileges." The statutory right to a hearing, however, exists only when a decision on privileges is made by a peer review body, and only when the decision is reportable to the Medical Board because it is based on " '[m]edical disciplinary cause or reason,' " defined as an "aspect of a [physician's] competence or professional conduct . . . is reasonably likely to be detrimental to patient safety or to the delivery of

13

patient care." (§ 805, subd. (a)(6); see § 809.1 [right to hearing to contest decision or recommendation made by peer review body "after informal investigatory activity or prehearing meetings" if a report must be filed under section 805]; see § 805, subd. (b)(1) [report required if peer review body rejects application for staff privileges "for a medical disciplinary cause or reason"].)

Dignity's decision to deny privileges to physicians with disciplinary histories, however, does not require reports to the Medical Board under section 805. The denial of Kime's application did not result from any "adjudicatory/quasi-judicial decisions" by Mercy "about [Kime's] competency" or professional conduct. (*Economy*, *supra*, 31 Cal.App.5th at p. 1160.) It resulted from information about Kime's suspension and the public reprimand issued in connection with the already-adjudicated Clearlake Hospital incident that Mercy discovered during its verification process. The fact that Kime's disciplinary *history*—that is, his suspension and reprimand, which led Mercy to deny his application—arose from actions taken against Kime by Clearlake Hospital for a "[m]edical disciplinary cause or reason" as defined in section 805, subdivision (a)(6) does not mean that *Mercy's* action was taken for a "[m]edical disciplinary cause or reason" as defined in section 805.

Unlike Clearlake Hospital, Mercy never evaluated Kime's competency or conduct as it pertained to his suspension at Clearlake Hospital, or as it pertained to patient care at Mercy. Moreover, the "basic purpose" for filing section 805 reports, which is "to notify [the Medical Board] of events which might warrant the investigation of a licensed physician" would not be served by Mercy's filing a report about its rejection of Kime's application. (*Dorn v. Mendelzon* (1987) 196 Cal.App.3d 933, 942; see also *Stiger v. Flippin* (2011) 201 Cal.App.4th 646, 656 [filing of section 805 reports is "essential to . . . the

14

[Medical] Board's ability to carry out its 'highest priority' of exercising disciplinary authority to protect the public from incompetent, impaired, or unscrupulous physicians"].) A section 805 report must include "a description of the facts and circumstances of the medical disciplinary cause or reason." (§ 805, subd. (f)(2).) The facts and circumstances of Kime's actions at Clearlake Hospital had *already* been reported to the Medical Board, and Mercy had nothing to add about those actions. We fail to see what purpose would be served by requiring Dignity, and all the other hospitals that may have refused privileges to Kime because of the Clearlake Hospital suspension, to file reports informing the Medical Board that Kime had been denied privileges because of that suspension (which was the subject of the 805 Report) and the Medical Board's subsequent reprimand. In short, Kime has not persuaded us that public policy is violated by an eligibility requirement that bars a physician from staff privileges because of the physician's disciplinary history.

Kime's other arguments on this issue of whether the eligibility requirements are quasi-legislative were not raised below, but are made the first time on appeal. Kime argues that the requirements set forth in the Agreement are not quasi-legislative because there is no evidence that the hospital's board approved them; because there is no evidence as to "why [Dignity] supposedly banned physicians with disciplinary histories from working at Mercy to address administrative problems"; because they are not rules of general application to address administrative problems but instead "target" a "disfavored group of physicians based upon their alleged competence"; and because it is arbitrary and discriminatory to "ban all physicians for merely having" disciplinary histories, which might be based on reasons such as an illness affecting competence, failure to renew a fictitious

15

business permit, or pay taxes or pay child support. Because these arguments were not raised in Kime's opposition to Dignity's motion below, they have been forfeited and we need not, and do not, address them. (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676-677 [arguments and theories not raised in the trial court in opposition to summary judgment are forfeited, "including assertions as to deficiencies in defendants' evidence"]; see also *Wisner v. Dignity Health* (2022) 85 Cal.App.5th 35, 44-45 [appellate court need not consider argument raised for the first time on appeal, even when argument presents questions of law on undisputed facts].)

In opposing summary judgment in the trial court, Kime's primary response to Dignity's claim that its eligibility requirements were quasi-legislative was to argue that the denial of his application was "quasi-judicial" because it was "clearly aimed at [him] individually." He argued that because the Agreement between Mercy and Valley Emergency Physicians "clearly indicates [that] exceptions to the warranties would be made on a case-by-case basis," the decision to not make an exception in his case was "discretionary decision-making [that] is judicial in character." This argument rests on an interpretation of the Agreement that we have rejected.

Kime also argued below that Dignity's rule was not quasi-legislative because it was "discretionary." This argument rested on a false premise: a hypothetical "broadly-worded warrant[y] regarding disciplinary history or 'unprofessional behavior,'" which, Kime argued, would allow a hospital to arbitrarily "bar one physician who had been allegedly 'unprofessional,' while permitting another physician with such a history to be admitted." But the warranty at issue here says nothing about "unprofessional behavior." To the contrary, section 3.13 addresses only objective criteria: Has a physician's

16

license to practice medicine been suspended? Has a physician ever been reprimanded, sanctioned, or disciplined by any licensing board? Has a physicians' staff privileges at any hospital ever been suspended for a medical disciplinary cause or reason? The application of the warranties here does not require any discretionary determination. Just as the application of the challenged policy in *Hay* (whether a physician had completed a residency in a particular field) did not require the exercise of any discretion (*Hay*, *supra*, 183 Cal.App.3d at p. 756), so too here.

In sum, we conclude that Dignity met its burden to come forward with evidence—in the form of its contract with Valley Emergency Physicians—that the eligibility requirements are quasi-legislative. Kime, on the other hand, has failed to come forward with evidence to create any triable issue of fact as to the status of the requirements as quasi-legislative and has failed to show that the eligibility requirements cannot be quasi-legislative as a matter of law.

3. *Kime Had No Right to a Hearing.*

Kime also argues that even if the eligibility requirements are quasi-legislative, he is entitled to a hearing, and Dignity is not entitled to summary judgment because Dignity failed to prove that his application for privileges was denied *because* he failed to meet the eligibility requirements. We are not persuaded. As Kime admits, his application was denied because of the public reprimand and the conduct that was the subject of the 805 Report filed by Clearlake Hospital about Kime's resignation while under investigation after a summary suspension.

There is no genuine dispute that Kime—whose staff privileges at Clearlake Hospital had been suspended for a " '[m]edical disciplinary cause or reason' " (§ 805, subd. (a)(6)), and who had been reprimanded by the Medical

17

Board, effective April 27, 2018—did not meet the quasi-legislative eligibility requirements for providing emergency services at Mercy, as set forth in section 3.13 of the Agreement.  Because Kime did not meet those requirements, he had no common law right to a hearing when Mercy stopped processing his application for privileges.

Nor did Kime have any right to a hearing under section 809.1.  Kime argues that Mercy is a "peer review body" under section 805, subdivision (a)(1)(B); that Mercy rejected his application because of his alleged conduct at Clearlake, which, as shown by the existence of the 805 Report, qualified as a "medical disciplinary cause or reason"; and that therefore Mercy rejected his application for a medical disciplinary cause or reason, necessitating the filing of an additional section 805 report.  (See § 809.1, subds. (a), (b)(3) [right to hearing for physician who is the subject of action by a peer review body for which a section 805 report must be filed].)  Dignity argues that no peer review body acted on Kime's application and that in any event the rejection did not require the filing of a section 805 report because the rejection was based on Kime's failure to meet Mercy's threshold eligibility requirements (which apply generally to all emergency department physicians), rather than particular concerns about Kime's "competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care."  (§ 805, subd. (a)(6) [defining " '[m]edical disciplinary cause or reason' "].)

Regardless of whether the decision to stop processing his application, effectively denying Kime's application, was made by a peer review body (an issue we need not reach), we conclude that the decision did not require the filing of a report under section 805 for the reasons we outlined above in our discussion of Kime's argument that the eligibility requirement violated public

18

policy by undermining statutory hearing rights.  Mercy's action in denying Kime's application, which was based on Kime's disciplinary history that resulted from his conduct at a different hospital, did not require the filing of a section 805 report.

We find it instructive to consider cases in which courts have found that a physician was entitled to a hearing under section 809.1 because of action taken for a medical disciplinary cause or reason:  the facts of those cases are unlike the facts here.  (See, e.g., *Alaama v. Presbyterian Intercommunity Hospital, Inc.* (2019) 40 Cal.App.5th 55, 66 [terminated physician's " 'fail[ure] to address the safety concerns and patient care needs expressed by . . . the operating room staff,' " and "inhibiting the hospital staff from providing a bed for a vomiting patient" is conduct that constitutes a " 'medical disciplinary cause or reason' " under section 805 and triggers the section 805 reporting requirement]; *Economy*, *supra*, 31 Cal.App.5th at pp. 1152, 1155, 1157 [anesthesiologist's suspension and termination were based on a "medical disciplinary cause or reason" under section 805 where plaintiff's documentation of pharmaceutical use at hospital was " 'completely unacceptable for this doctor' " after extensive training and "hospital was 'not comfortable with the quality of care provided by [plaintiff] and cannot approve anesthesia coverage schedules containing' him"].)  Kime does not cite any cases in which an action like the one taken by Mercy, which was based on his documented disciplinary history with Clearlake Hospital and the Medical Board, gave rise to statutory hearing rights.  Just as Kime had no right to a hearing under the common law, he had no right to request a hearing under section 809.1, subdivision (b).

## DISPOSITION

The judgment is affirmed.  Dignity shall recover its costs on appeal.

 

 

_____
Miller, J.

WE CONCUR:

_____
Stewart, P.J.

_____
Mayfield, J.*

A166748, *Kime v. Dignity Health, Inc.*

---

\* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 4/25/24 after unpublished opinion filed 3/29/24
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RYAN KIME,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>DIGNITY HEALTH, INC.,<br><br>      Defendant and Respondent. | A166748<br><br>(San Francisco County<br>Super. Ct. No. CGC20586388)<br>ORDER GRANTING PUBLICATION |

BY THE COURT:

The opinion in the above-entitled matter filed on March 29, 2024, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____          _____

                                    Stewart, P.J.

1

Court: San Francisco County Superior Court

Trial Judge: Hon. Richard Ulmer, Jr.

The Brinegar Law Firm, Matthew A. Brinegar, for Plaintiff and Appellant

Manatt, Phelps & Phillips, Barry S. Landsberg, Doreen W. Shenfeld, Joanna S. McCallum, Craig S. Rutenberg, for Defendant and Respondent

Arentfox Schiff, Lowell C. Brown, Debra J. Albin-Riley, Annie C. Lee, M.H. Joshua Chiu for California Hospital Association as Amicus Curiae on behalf of Defendant and Respondent

A166748, *Kime v. Dignity Health, Inc.*