Filed 5/17/24

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| JESSICA HOGLUND, | C097065 |
| Plaintiff and Appellant, | (Super. Ct. No. CU18-083045) |
| v. | |
| SIERRA NEVADA MEMORIAL-MINERS HOSPITAL et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Nevada County, Thomas M. Anderson and S. Robert Tice-Raskin, Judges. Affirmed.

Goodman Law, Karen M. Goodman; and C. Athena Roussos for Plaintiff and Appellant.

Atkinson, Andelson, Loya, Ruud & Romo, Catherine M. Lee, Mae G. Alberto and Rex Darrell Berry for Defendants and Appellants.

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of sections IV and VI of the Discussion.

1

Plaintiff Jessica Hoglund (Hoglund) sued her employer, defendant Sierra Nevada Memorial-Miners Hospital (Hospital), and her supervisor Rhonda Horne (Horne) (together, defendants) for age discrimination, harassment, and wrongful termination. Following a bench trial, the trial court found for Hoglund on those claims and awarded her $1,431,800 in economic and non-economic damages, along with $958,297 in attorney fees and $57,333 in costs. Defendants appeal on numerous grounds, challenging the verdict as unsupported by sufficient evidence, the damages as excessive, the statement of decision as inadequate, and the award of attorney fees and cost items as lacking evidentiary support. Hoglund cross-appealed, arguing that the trial court erred by failing to award a tax neutralization payment. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Facts*

In 2004, the Hospital hired Hoglund as a phlebotomist trainee. In February 2011, at age 56, Hoglund became the sole laboratory supervisor, supervising all of the phlebotomists at the Hospital. She loved her job and worked well with her supervisor. Hoglund hoped to work at the Hospital until she was 72.

In May 2011, the Hospital hired Horne as its director of clinical operations, making Horne Hoglund's new supervisor. Horne was six years younger than Hoglund. From the time Horne was hired until Hoglund was terminated, Horne made derogatory comments to Hoglund about her age. Horne and Hoglund would have frequent one-on-one meetings, in which Horne would tell Hoglund she looked "sloppy," that she disliked her hair and manner of dress, and that she thought Hoglund was "old-fashioned." Hoglund found Horne's critiques unnerving, as she felt her appearance was perfectly acceptable, and had never been criticized for her dress before. Horne also asked Hoglund multiple times how long she was planning on staying, and if she was going to retire. Horne commented quite a bit that "we have an aging staff." When a position was posted,

2

she would mention the "aging staff" and ask, "[W]ho do you think is going to retire next"? Horne said she "wanted to hire babies" because "they're easier to train." She told Hoglund that Hoglund had been at the Hospital "since the dark ages," and that Hoglund knew "where all the bodies are buried" with respect to which employees had come and gone. When Hoglund prepared schedules on paper, Horne criticized her for doing it "the old fashioned way." However, she did not train Hoglund on how to use the scheduling computer program, instead telling her, "You just don't know how to do it."

Horne moved lab and office equipment into Hoglund's office, which forced Hoglund out, such that she had no workspace for over a year. She carried around her things daily, looking for an area in which to work. When Hoglund asked Horne for a stable workspace, Horne said that if she "didn't shut up about it" she would "have [Hoglund] working out of the back of [her] truck."

Horne also made comments about Kaye Holzworth, who was Hoglund's supervisor at the time Hoglund was hired. Horne asked Hoglund how old Holtzworth was, how long she had been employed by the Hospital, and if she would leave her employment soon. In 2013, Holtzworth retired. Horne commented that "it was time for [Holtzworth] to move on and maybe it was time for [Hoglund] to move on as well."

Hoglund felt Horne was trying to push her out of her job. In October 2013, Hoglund told Chery Mullaly in the human resources unit that Horne was abusive, mocked her clothes and hair, and made derogatory comments about her in front of Hoglund's subordinates. She told Mullaly that Horne "thinks I'm too old to do my job." Mullaly told Hoglund to talk to the chief executive officer (CEO) of the Hospital, but it did not make sense to Hoglund to talk to a CEO about an employment issue, so she did not do so.

In November 2013, Horne relocated Hoglund's workstation to a storage area in a separate building, requiring Hoglund to walk and drive to various locations around the Hospital every day to complete her tasks, which made her feel isolated and "pushed out" by Horne. In December 2013, Hoglund again reported her difficulties getting along with

3

Horne to Mullaly, and Mullaly suggested she talk to Horne. Hoglund asked Horne if they could talk through the problems, but Horne responded by criticizing Hoglund for "coddl[ing]" the phlebotomists.

In 2014, Hoglund went to work with a new haircut. When Horne arrived, she said in an unfriendly manner, in front of Hoglund's staff, "Why did you do that to your hair? Are you trying to look like a young person? I need to take you to my hairdresser." Hoglund was embarrassed and reported the incident to Mullaly. Mullaly again suggested Horne go to the CEO of the Hospital with her issue, which Hoglund did not think made sense. On another day, Horne told Hoglund she looked "dowdy" in front of her staff, causing the staff to ask her if she was handling Horne's comments okay and if Horne was trying to push her out. Also in 2014, Hoglund asked Horne for a workspace in the main lab, and Horne responded, "Maybe you're too old to be doing all this running around."

In 2014, Hoglund's job duties expanded, as the Hospital hired up to 50 phlebotomists for Hoglund to review, train, and supervise. By August 2014, Hoglund was working 12-hour days, and answering night and weekend calls. She was "trying desperately" to keep up with all the extra staff and duties she had been given. However, Horne's review stated that Hoglund was just "meeting expectations." In September 2014, Hoglund told Apryl Lucas in human resources that Horne was treating Hoglund poorly, was overworking her, forced her to run circles between her building and the main lab, and was trying to "run [her] out" because she thought she was "too old to do" her job. Lucas recommended that Hoglund get individual counseling. Horne continued to comment when around Hoglund that they "need to hire young people," that when a young person was hired "they should catch on quick," and other such comments that were "kind of a running theme."

In 2015, the Hospital decided to convert its computer program. Hoglund had been very proficient at the old program and had trained others on it. She asked Horne for training on the new program, because it would be essential for her job, but Horne said

4

they would not send management for training. Instead, she said they would "pick out young people because they're easier to train." So, Horne chose Elizabeth Prout for the "train the trainer" training, along with other younger employees. Prout was 31 years old at the time. The criteria for the training program were the employees' technical skills and ability to teach, but Horne had not observed that Prout had any technical or teaching skills.

In March 2015, Hoglund and other employees attended Prout's training class. Another lab employee told Hoglund the main lab was falling far behind due to the training, and someone needed to go to the lab. Hoglund told Horne she felt she should go to the lab to attend to the patients, and she could go to class later in the week. Horne loudly told Hoglund to "sit down and shut up" and called her the "problem child of the class." Hoglund was shocked and started to cry. She was upset because Horne said this in front of her subordinates, and also because Horne would not allow her to help her staff or the patients. The following day, Hoglund told Horne's supervisor Deb Plass that Horne was abusive, trying to push Hoglund out, and that she believed Horne wanted someone younger. Plass offered to meet with Hoglund twice weekly until the issue was straightened out, but they only had one or two meetings. Plass did tell Horne that Hoglund complained about her treatment at the training, and Horne admitted to making offensive comments and claimed she had apologized, such that Plass thought the issue was resolved. Several days later, Horne told Hoglund, "I'm sorry what I said made you feel bad, and now I'm in trouble because of you." Around that time, Hoglund went to see her doctor for extreme stress due to Horne's treatment of her. She was breaking out into hives, rashes, and cold sores, and felt a physical burning.

A couple of days after the training incident, Horne informed Hoglund that Horne and Plass had decided to hire a second lab supervisor, who would be Hoglund's equal. Hoglund responded that she needed an assistant or scheduler, but did not need a second supervisor. Nonetheless, Horne and Hoglund eventually interviewed Prout for the

supervisor position without informing Prout of the purpose of the interview. Both Horne and Hoglund supported hiring Prout for the position. In June 2015, Prout was promoted to second supervisor. Prout did not have any supervisory experience, or experience in the technology field, and did not have a bachelor's degree. Prout was a waitress prior to her job at the Hospital. Hoglund trained Prout, who relied on her for advice and assistance.

In March 2015, Hoglund applied for an open pathology secretary job so that she could have less contact with Horne, even though it paid less. She informed Plass of her application so that Plass was not "shocked." Hoglund believed she was qualified because she had previously been a pathology secretary. However, Horne rejected Hoglund for the position without an interview. Horne told Hoglund that she had a per diem already doing the job who she did not want to "boot," and that she would be posting another pathology secretary position later that Hoglund would get. In May 2015, the Hospital transitioned to its new computer program, which was a "very, very difficult time for everybody," caused lab backups, and forced Hoglund to work even longer hours. At that time, Hoglund worked daily from 5:00 a.m. until 9:00 or 9:30 p.m. Hoglund asked Horne and Plass for additional support, but did not receive any. Horne informed Hoglund that she was unable to get more help.

In July 2015, Hoglund learned her sister had cancer, and asked Horne for a decreased workload so she could help provide care. Horne told her that "would not work," and that she should take a leave of absence instead, which Hoglund did. When Hoglund returned to work in November 2015, her workspace had been moved to a tiny wheelchair storage closet in a separate building, with no windows or ventilation. On her first day back, Horne told Hoglund that Prout was doing great, they did not really need Hoglund, was "surprised [Hoglund] didn't just retire," and that Hoglund "wasn't really needed and [should] just go sit in" a distant building. Hoglund was heartbroken. She also learned that Horne had given the second pathology secretary position to a young man, rather than to Hoglund as promised. Hoglund emailed Lucas in human resources

6

and wrote that she felt Horne was "trying to keep [her] out of that position that [she] need[s] very much." Hoglund met with Lucas, who told Hoglund that Horne had wanted someone with Excel spreadsheet application experience. Hoglund said that she did have Excel experience, and Lucas said that maybe Horne did not know that. Six days after returning to work, Hoglund took another leave of absence because she was extremely distraught. In early December 2015, Horne sought approval to post Hoglund's position as supervisor so that she could have Hoglund replaced.

Hoglund returned to work on December 27, 2015. At that time, Hoglund and Prout "both did both jobs." However, Hoglund was tasked with more outreach (outpatient) services, while Prout was tasked with more inpatient services. Horne informally assigned many of the outreach employees to Hoglund and inpatient employees to Prout, though both Prout and Hoglund oversaw all employees, and the employees were not told they had one specific supervisor. At that time, Horne and Plass were involved in an ongoing discussion at the Hospital about possibly selling the outreach stations, which had been discussed for the past few years. Hoglund also continued to train Prout and helped Prout with employee evaluations when Prout fell behind, at the request of Horne and Plass.

Throughout 2016, Horne continued to say comments to Hoglund such as, "We need to hire babies. You've been here since the dark ages . . . . It's time for new blood. You could have just stayed out. Why didn't you just retire? [Prout's] doing a great job."

Hoglund's September 2016 performance review said that she helped improve patient satisfaction scores, but according to a survey of her employees, she needed to "strengthen the employee relationships." However, the employment survey generally addressed the employees' relationship to "management" and was not specific to Hoglund. Hoglund spoke to the employees about the negative feedback, who said their criticism was directed at Horne, not Hoglund. Hoglund met with Horne, and told Horne she did not believe those were her scores, but that she was willing to help increase the scores

nonetheless.  Horne did not offer any comments about what Hoglund could do to increase the scores.  Instead, Horne said that Plass wanted Hoglund "written up" for the low engagement scores.  Hoglund said that was not appropriate, because those were not her scores.

Hoglund went to Plass about the conversation, who said that she (Plass) was in fact not writing Hoglund up for those scores, and that Plass would talk to Horne.  Plass reviewed the comments, one of which complained that Horne made "rude" and "inappropriate" comments, yelled at employees, and played favorites.  Another said that Horne should be replaced with someone who cares about their employees.  Another employee said Horne "needs to go ASAP" but that Hoglund and Prout were doing an "awesome job as supervisors.  They work hard and genuinely like everybody."  Hoglund went to Lucas about the anonymous employee comments, who did nothing in response.

By the end of 2016, there was a "mass exodus of staff" and Hoglund was filling in shifts for missing staff.  Hoglund again told Lucas that Horne thought she was too old for her job and was trying to push her out.  Lucas responded that she would look into it.

In June 2017, the Hospital sold its outreach stations, resulting in a reduction in Hospital staff.  Horne, Plass, and Lucas worked together on the downsizing, and the three of them determined that only one lab supervisor position would remain.  Lucas and Plass relied on Horne to describe the job requirements of the lab supervisor.

Ultimately, all three agreed that Prout would be the sole supervisor because she was better qualified than Hoglund.[1]  Specifically, they decided to fire Hoglund and retain Prout because Prout had "basic computer acumen" and adapted to the new computer system, whereas Hoglund struggled with her computer skills.  However, Plass had not observed Prout on the new computer system, and neither Plass nor Lucas knew that

---

[1]     Horne testified that she was one of the "decision makers" in the Hospital's decision to terminate Hoglund, but Plass "ultimately [ ] made th[e] decision."

Hoglund sought and was denied additional training on the system. They also based their termination decision on the fact that the majority of the fired employees were part of the outreach services program, and Horne had informed Plass and Lucas that Hoglund managed the outreach services program while Prout managed the inpatient services. However, Hoglund was never officially made an outreach services manager, as Horne's request to create the position of outreach services manager was never fulfilled.

Both Prout and Hoglund had excellent performance evaluations, and Hoglund had a good reputation as a reliable worker. Hoglund had been a lab supervisor at the Hospital for four years longer than Prout. Hoglund was 62 years old and Prout was 33 years old. In total, the Hospital laid off approximately 17 employees due to the downsizing.

On June 2, 2017, Horne told Hoglund she would be terminated, and Hoglund was shocked. She had been at the Hospital for 13 years, had seniority, was a good employee, and was not finished training Prout. Hoglund asked Lucas why she was terminated, and Lucas said it was because Hoglund was the outreach services manager. Hoglund told Lucas she had never been designated the outreach services manager, and Lucas responded Horne had told Lucas that was Hoglund's job.

In a discussion at that time, Horne said that she felt sorry for the younger people with families losing their jobs. Hoglund responded she also felt sorry for older people, who might have a harder time with it. Horne laughed and said, "[T]hat's discrimination, that it doesn't work like that." Horne said Hoglund had "done [her] time" and was "close to retirement." However, Hoglund had planned to work for many more years. Hoglund spoke to Plass, who said that Horne blamed Hoglund for everything that went wrong in the laboratory, and that now Horne "would be easier to watch." Hoglund's last day was July 7, 2017.

Thereafter, at least six employees told Lucas how sad they were that Hoglund was terminated. They explained that the low employee engagement scores from their employee surveys were for their director (Horne) and not their supervisors. When Lucas

9

learned that the low engagement scores were intended for Horne, rather than Hoglund, she was surprised by the revelation.

Consequently, the Hospital held focus groups. At least one employee expressed his or her belief that Hoglund had been set up by being sent to outreach services so that Horne could terminate her. Employees also complained that Horne was retaliatory and gave preferential treatment when awarding positions to staff. They found it unfair that people were laid off, yet jobs were brought back shortly thereafter. The Hospital did hire a pathology secretary and team lead phlebotomist later in 2017, after Hoglund was terminated.

In August 2017, a month after her termination, Hoglund was diagnosed with lung cancer. She consequently had surgery in September 2017, and was unable to work until the beginning of January 2018. The loss of her job made her feel absolutely devastated, and she felt more stressed than she had ever been in her life. It was emotionally rougher than her cancer diagnosis. Her confidence was "demolished," because prior to her employment at the Hospital, she had thought she was a good employee. Hoglund had awful nightmares every night that she was working at the Hospital and hiding from Horne.

II

*Procedural History*

On February 9, 2018, Hoglund filed an administrative complaint with the Department of Fair Employment and Housing (DFEH), which she amended on February 15, 2018, to include age discrimination. On May 25, 2018, DFEH issued a right to sue letter. On June 12, 2018, Hoglund filed her complaint, which she later amended, rendering the First Amended Complaint (FAC) the operative complaint. The FAC alleged five causes of action: (1) retaliation under the Fair Housing and Employment Act

(FEHA) (Gov. Code, § 12940 et seq.)[2]; (2) FEHA age discrimination (§ 12940, subd. (a); (3) FEHA harassment (§ 12940, subd. (j); (4) wrongful termination in violation of public policy; and (5) failure to pay overtime wages (Lab. Code, § 510). Defendants moved for summary judgment or adjudication, and the trial court granted summary adjudication of Hoglund's retaliation claim and for punitive damages, but denied the rest of the motion.

In January 2022, the case proceeded to a bench trial. In June 2022, the trial court issued a ruling on submitted matter, and in response, defendants filed a request for a statement of decision, asking the court to explain the factual and legal basis for eight controverted issues. The trial court issued a statement of decision and proposed judgment. Defendants filed objections to the proposed statement of decision, listing the same eight issues that they still believed had not been adequately addressed by the court.

On July 28, 2022, the trial court issued its final statement of decision and final judgment. It found in favor of Hoglund on her claims for age discrimination, harassment, and wrongful discharge, but found for the Hospital on the unpaid overtime claim. It found Horne jointly and severally liable with the Hospital for the harassment claim. The trial court awarded Hoglund $1,431,800 in damages, comprised of $881,800 in economic damages (past and future wages/benefits and COBRA (Consolidated Omnibus Budget Reconciliation Act of 1985) payments) and $550,000 in noneconomic, emotional distress damages. In January 2023, it issued an amended judgment, which also awarded Hoglund $958,297 in attorneys' fees and $57,332 in costs.

---

[2]     Undesignated section references are to the Government Code.

11

DISCUSSION

I

*Timeliness of Suit*

Defendants first contend that the trial court erroneously applied the continuing violations doctrine, which allowed it to improperly rely on time-barred evidence of harassment and discrimination. They argue that the one-year statute of limitations under FEHA precludes their liability for any conduct prior to 2014, which was when, according to defendants, Hoglund believed defendants' discrimination and harassment had become permanent and would never be resolved. We are not persuaded.

"A plaintiff suing for violations of FEHA ordinarily cannot recover for acts occurring more than one year before the filing of the DFEH complaint." (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1400 (*Jumaane*); accord *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 818 (*Richards*); see § 12960, subd. (e).) Where applicable, the continuing violations doctrine provides an equitable exception to the one-year statute of limitations for FEHA actions. (*Richards, supra*, 26 Cal.4th at pp. 823-824.) The doctrine "allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period." (*Id.* at p. 802.) The employer's unlawful actions are "sufficiently connected" if they satisfy three criteria: (1) the unlawful conduct occurring outside the statute of limitations is "sufficiently similar in kind" to the unlawful conduct within the limitations period, (2) the unlawful actions have occurred with "reasonable frequency," and (3) they have not "acquired a degree of permanence." (*Id.* at p. 823.)

Here, defendants challenge only the third criterion, i.e., whether defendants' failure to end the harassment and discrimination had acquired a degree of permanence in 2014, such that the cause of action began to accrue. " 'Permanence' " in this context means "that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or

12

end harassment will be futile. [¶] Thus, when an employer engages in a continuing course of unlawful conduct under the FEHA by . . . engaging in [ ] harassment, and this course of conduct does not constitute a constructive discharge, the statute of limitations begins to run . . . *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain. Accordingly, an employer who is confronted with an employee seeking . . . relief from . . . harassment may assert control over its legal relationship with the employee either by accommodating the employee's requests, or by making clear to the employee in a definitive manner that it will not be granting any such requests, thereby commencing the running of the statute of limitations." (*Richards, supra*, 26 Cal.4th at pp. 823-824.)

The plaintiff bears the burden to demonstrate that his or her claims are founded on a pattern or practice of employer conduct that continued into the limitations period. (*Jumaane, supra,* 241 Cal.App.4th at p. 1402.) We review the trial court's determination for substantial evidence, considering the facts in the light most favorable to Hoglund. (*Richards, supra,* 26 Cal.4th at p. 802, fn. 2.)

There is no dispute that Horne's unlawful conduct began in 2011, years before Hoglund filed her February 9, 2018, administrative complaint with DFEH. Nevertheless, the trial court found that defendants "engaged in a continuous course of unlawful conduct under the FEHA and that the statute of limitations did not begin to run until that course of conduct was brought to an end; i.e., when [Hoglund] was discharged." Defendants dispute this finding, based on various pieces of Hoglund's testimony. For example, Hoglund testified that in 2014 she "wanted to give up." She felt as though Horne's harassment continued, even after she complained, and that by September 2014, her complaints were "being ignored." And, although Hoglund "never lost faith in" the Hospital, Plass, or Lucas, or "that something would change," she "found [she] was beating a dead horse to try to find a better way to get along [with Horne]."

13

At the outset, we emphasize that the question of permanence—i.e., whether the employer has made clear that any further efforts to resolve the harassment and discrimination would be futile—is based primarily on the *employer's* actions and statements, and not, as defendants suggest, the employee's subjective belief. (See *Richards, supra*, 26 Cal.4th at p. 823-824.) Here, Hoglund's statements do not establish that defendants either (1) asserted control over their relationship with Hoglund by resolving her complaints, or that they (2) definitively made it clear to Hoglund that they would not address her complaints. (See *Ibid.*) To the contrary; substantial evidence supports the finding that defendants neither resolved Hoglund's issues nor communicated to Hoglund by acts or statements that they refused to do so. Rather, Lucas and Plass listened to Hoglund's concerns and either made suggestions to help Hoglund improve the issue, discussed Hoglund's complaints with Horne, or promised further action. Moreover, while Hoglund eventually felt her efforts at a collegial relationship with Horne became "futile," she "never lost faith" that the Hospital would put an end to Horne's harassment and discrimination. She continued to "hope something would be done," aware that "the wheels upstairs roll really slow." This is consistent with the Hospital's continued, albeit tepid and ineffective, engagement with Hoglund regarding her complaints. Thus, substantial evidence supports the trial court's finding that the defendants' actions had not acquired a degree of permanence. (See *Blue Fountain Pools & Spas Inc. v. Superior Court of San Bernadino County* (2020) 53 Cal.App.5th 239, 253 [permanence was a question of fact where the employer tried and failed to resolve the employee's multiple complaints of sexual harassment, but did not "make clear [ ] in a definitive manner" that their efforts to resolve it would cease].)

The facts here are distinguishable from the line of cases finding permanence where the employer expressly and repeatedly denied the employee's complaints, definitively stymying any prospect for resolution. (See, e.g., *Jumaane, supra,* 241 Cal.App.4th at pp. 1403-1404 [statute of limitations began after an employee was suspended, his

14

employer affirmatively denied his grievances, and the employee knew the resolution was hopeless]; *Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1035-1037, 1042-1043 [permanence established after the supervisor denied the employee's request to work in a different job, offering only to transfer her out of the department]; *Acuna v. San Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402, 1414-1415 [failure to accommodate claim became permanent after the employer denied the employee's accommodation request and the employee filed a DFEH complaint and hired an attorney].) Here, unlike the foregoing cases, the Hospital never denied a formal complaint by Hoglund, nor communicated a refusal to cooperate; in fact, the Hospital continued to listen to Hoglund's complaints, albeit ineffectually. And Hoglund did not give up on the prospect of resolution. We therefore find no error in the trial court's ruling that the continuing violation doctrine applies, and that her termination triggered the running of the statute of limitations. Accordingly, the trial court properly considered evidence of liability during the entire course of Hoglund's employment with the Hospital.

II

*Substantial Evidence*

Next, defendants contend that the trial court's verdict for Hoglund is not supported by substantial evidence. We do not hesitate to conclude that sufficient evidence supports the verdict.

A. *FEHA Age Discrimination*

Under the FEHA, it is unlawful for an employer to discriminate against a person because of age. (§ 12940, subd. (a).) A plaintiff is in a protected class for purposes of an age discrimination lawsuit if he or she is 40 years of age or older. (§ 12926, subd. (b); *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 978.) An employee alleging age discrimination has the burden to prove at trial that an adverse employment action was taken because of his or her age. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1002.) "The phrase 'because of' means there

15

must be a causal link between the employer's consideration of [the] protected characteristic and the [adverse] action taken by the employer." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215.)

An employee can prove a FEHA violation in one of two ways: by direct evidence of intentional discrimination or by circumstantial evidence. (*DeJung v. Superior Court of Sonoma County* (2008) 169 Cal.App.4th 533, 549 (*DeJung*).) Because direct evidence of intentional discrimination is seldom available, California courts use the burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668] (*McDonnell Douglas*) as an aid for trying claims of discrimination based on circumstantial evidence. (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

Under the *McDonnell Douglas* test, the plaintiff has the initial burden at trial to establish a prima facie case of age discrimination. (*Guz, supra*, 24 Cal.4th at p. 354.) This requires a showing that: (1) the plaintiff was a member of a protected class; (2) the plaintiff was qualified for the position sought or was performing competently in the position held; (3) the plaintiff suffered an adverse employment action; and (4) the adverse action occurred under some circumstance suggesting discriminatory motive (such as the employee was replaced in his or her position by a significantly younger person). (*Id.* at p. 355.)

If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the employer to produce evidence which, if taken as true, would justify a judgment for the employer that the adverse employment action was taken for a legitimate, nondiscriminatory reason. (*Guz, supra*, 24 Cal.4th at pp. 355-356.) If the employer sustains its burden, the presumption of discrimination drops from the case and the burden shifts back to the employee to prove the stated reason was a pretext to disguise illegal discrimination. (*Guz*, at pp. 356, 361; *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 664 (*Clark*).) At trial, a plaintiff

16

may show pretext either directly, by showing that unlawful discrimination more likely than not motivated the employer, or indirectly, by showing that the employer's proffered explanation is "unworthy of credence." (*DeJung, supra*, 169 Cal.App.4th at p. 553; *Clark, supra*, 6 Cal.App.4th at pp. 664-665.) " 'Pretext may . . . be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination.' " (*Nazir v. United Airlines, Inc*. (2009) 178 Cal.App.4th 243, 271-272.) Alternatively, a plaintiff may prove "mixed motives," by showing that there was a "mix of discriminatory and legitimate reasons" that motivated the employment decision, but that discrimination was a substantial motivating factor for the adverse action. (*Harris v. City of Santa Monica, supra,* 56 Cal.4th at pp. 215, 232.)

We review Hoglund's FEHA and wrongful termination claims for substantial evidence. (*Schmidt v. Superior Court of Ventura County* (2020) 44 Cal.App.5th 570, 581-582.) In doing so, we accept all evidence in support of the judgment, draw all reasonable inferences to affirm the judgment, and may not reweigh the evidence. (*Ibid.*)

Defendants do not challenge that Hoglund was over the age of 40, was qualified for her job, and performing competently, or that her termination was an adverse employment action. They solely dispute the trial court's finding that Hoglund was terminated based on her age, contending the record is devoid of any such evidence. However, while defendants point to testimony from Hoglund and others that do not mention age discrimination, defendants ignore the substantial evidence that *does* support a finding of discriminatory motive, and evidence of pretext.[3]

---

[3]    Indeed, the statement of facts in defendants' opening brief is distressingly sparse, as it omits virtually all evidence of harassment and discrimination that emerged at trial. Hoglund contends that we should find defendants forfeited their challenge to the sufficiency of the evidence, for failing in their obligation to present a fair statement of the facts. We agree that defendants have not fully complied with their duty to fully and fairly

17

First, Hoglund presented copious evidence of Horne's age discrimination. Horne criticized Hoglund's appearance as old-fashioned and dowdy. She repeatedly asked Hoglund when she would retire, saying Hoglund had been there since the dark ages and knew where all the bodies were buried. Horne asserted that she wanted to hire "babies" because they are easier to train, and she chose to train Prout on the new computer program in part because she believed young people are easier to train. When Hoglund asked for a more convenient workspace, because Horne had deprived her of an adequate workstation, Horne remarked that maybe Hoglund was "too old to be running around." Upon Hoglund's return from leave, Horne said she was surprised Hoglund did not just retire because she was not really needed, and continued to say it was time for "new blood" and she should have just retired. Horne expressed sympathy for the younger employees who were fired because they had families, and laughed when Hoglund said older employees might also struggle. Hoglund considered these constant comments to be ageist and offensive, telling both Plass and Lucas that she believed Horne sought to push her out due to her age. Horne's statements and actions towards Hoglund are substantial evidence of discriminatory animus towards Hoglund based on her age. (See, e.g. *Chearl v. El Camino Hospital* (2014) 223 Cal.App.4th 736, 755 [supervisor's statement that she preferred younger workers provided "ample basis" of discriminatory animus against older workers].)

---

present the evidence. "In every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment. [Citation.] Further, the burden to provide a fair summary of the evidence "grows with the complexity of the record. [Citation.]" [Citation.]' " (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739; see also Cal. Rules of Court, rule 8.204(a)(2).) While we do not go so far as to find defendants' arguments forfeited on this basis, we nonetheless caution counsel that future misrepresentations of fact, by omission or otherwise, may result in adverse rulings. (*Myers v. Trendwest Resorts, Inc., supra*, 178 Cal.App.4th at p. 749 [plaintiff waived substantial evidence argument on appeal by not adequately recounting defense's evidence].)

Next, the record supports the trial court's finding that Hoglund was terminated due to Horne's discrimination, and that defendants asserted legitimate basis for firing Hoglund was pretextual. We initially reject defendants' contention that Plass and Plass alone decided to terminate Hoglund, such that Horne's discrimination could not have motivated the adverse action. This argument is neither supported by the law nor the evidence.

Here, the trial court could find Horne's substantial involvement in the decision to terminate Hoglund and Horne's discriminatory animus towards Hoglund was sufficient to prove a discriminatory motive for termination under the "cat's paw" theory. In the employment context, " 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action. [Citation.]" (*EEOC v. BCI Coca-Cola Bottling Co.* (10th Cir. 2006) 450 F.3d 476, 484.) Under the "cat's paw" theory, a showing that any "significant participant" in the adverse employment decision exhibited discriminatory animus is "enough to raise an inference that the employment decision itself was discriminatory." (*DeJung, supra*, 169 Cal.App.4th at p. 551; see also *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 110 [plaintiff can establish causation by showing that any substantial contributor to the decision bore the requisite discriminatory animus].)

Here, substantial evidence supports the finding that Horne was a significant decision-maker in the choice to fire Hoglund. First, Horne testified that she was one of the three decision-makers in the Hospital's decision to terminate Hoglund. Further, Plass and Lucas relied on Horne for information about Hoglund's and Prout's skills and duties to determine whether termination was appropriate. Specifically, they relied on Horne's representation that Hoglund's role was in the outreach services program, and that Prout possessed superior computer skills. Indeed, they appeared to trust Horne's information, as they accepted her account without inquiry into whether Horne had officially assigned

19

outreach services supervision to Hoglund, provided Hoglund with adequate computer training, overburdened her with work, or given her a proper workspace. Nor did they have firsthand knowledge of Hoglund or Prout's computer skills, appearing to accept Horne's information about Hoglund's abilities at face value. This is sufficient to show that Horne was a significant participant in the decision to fire Hoglund.

Next, substantial evidence supports the trial court's finding that the reasons for termination—Prout's superior computer skills and Hoglund's role as "outreach services manager"—were pretextual. Horne refused to train Hoglund on the new computer program and trained Prout instead. While she later claimed she chose Prout based on her technical skills and ability to teach, she did not actually know whether Prout had either of those skills. In fact, Horne expressly stated that she preferred to train younger employees (such as Prout) on the computer system because they were easier to train. And, neither Plass nor Lucas had any firsthand knowledge of Hoglund's computer skills, nor did they know Horne denied Hoglund computer training. With respect to Hoglund's purported outreach role, Horne informed Lucas and Plass that Hoglund managed outreach services while Prout managed inpatient services. However, the Hospital never created an outreach services manager position, Hoglund and Prout shared many duties and jointly supervised all of the phlebotomists, and Hoglund also handled some inpatient care in the main lab. Additionally, Horne had been aware for years that the outreach stations were at risk of removal, yet attempted to define Hoglund's role as one directed towards outreach services. Horne's efforts to focus Hoglund's job duties in an area she knew may become defunct, along with other evidence of discriminatory animus towards Hoglund, suggests that Horne was trying to push her out, and that assigning her to outreach services would create the pretext to do so. Horne also stated that she felt sorry for the younger employees who were let go, but not for the older employees, further revealing that she chose to keep Prout and terminate Hoglund based on age. Finally, and generally

20

speaking, Hoglund had considerably more experience than Prout, and in fact, was still training Prout at the time she was terminated.

Based on the foregoing, there was sufficient evidence for the trial court to conclude that there was a causal link between defendants' discrimination and Hoglund's termination, and that defendants' asserted basis for terminating Hoglund was pretextual.

As we conclude substantial evidence supports the verdict for Hoglund's discrimination claim, we necessarily conclude that substantial evidence supports Hoglund's derivative claim for wrongful termination in violation of public policy. (See *Stevenson v. Superior Court of Los Angeles County* (1997) 16 Cal.4th 880, 897 ["FEHA's policy against age discrimination satisfies each of the four requirements that this court has established as essential to support a common law tort claim for wrongful discharge in violation of public policy"].)

B. *Harassment*

Defendants next contend Hoglund failed to establish that Horne harassed Hoglund because of Hoglund's age. While they concede that the witnesses found Horne to be a rude and an unkind manager, they argue this is not sufficient to reasonably infer that her animus was based on Hoglund's age. Defendants again cherry-pick their facts, omitting ample evidence of Horne's age-based harassment.

FEHA makes it unlawful for an employer to harass an employee because of the employee's age. (§ 12940, subd. (j)(1).) To succeed in a harassment claim, the employee must show that the harassment unreasonably interfered with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment. (*Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 581.)

As discussed, *ante*, Horne repeatedly made ageist comments to Hoglund, mocked her clothes and hair as old-fashioned, pushed Hoglund to retire, expressed preference for younger employees, moved her workspace to a faraway storage closet, and then questioned whether she was too old to walk long distances around the Hospital, refused

21

to train Hoglund based on her age, told Hoglund that she was unneeded and should retire after Hoglund returned from leave, and then laughed at Hoglund's concern for older employees who had been terminated, saying she only felt sorry for the younger ones. Hoglund experienced incredible stress, health problems, and a loss of confidence from the hostility and offensive nature of Horne's harassment. She expressed multiple times to management that she felt Horne was treating her this way because of her age, and that Horne was trying to push her out because of her age, based on the content of Horne's harassing statements. This is sufficient to support a finding that Horne harassed Hoglund because of her age.

III

*Damages*

Next, defendants challenge the trial court's damages award on four separate bases: (1) Hoglund would have been terminated regardless of discrimination, (2) Hoglund cannot recover economic damages for the time she was unable or unwilling to work, (3) Hoglund's recovery must be reduced for her failure to mitigate economic damages, and (4) Hoglund's emotional distress damages are excessive. However, we may not consider the merits of these arguments because defendants did not adequately preserve the issue for appeal.

As Hoglund notes in her responsive brief, defendants did not bring a motion for a new trial on grounds of excessive damages. "[A] failure to move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or a court without a jury. [Citation.] [jury trial, excessive damages]; [Citations; collecting cases.] The rule is a sound one . . . . [T]he power to weigh the evidence and resolve issues of credibility is vested in the trial court, not the reviewing court. (*Schroeder v. Auto Driveaway Co.* [(1974)] 11 Cal.3d 908, 919.) Consequently, where the ascertainment of the amount of damage requires resolution of conflicts in the evidence or depends on the credibility of

22

witnesses, the award may not be challenged for inadequacy or excessiveness for the first time on appeal.  To permit a party to do so without a motion for new trial would unnecessarily burden reviewing courts with issues which can and should be resolved at the trial court level.  (*Schroeder v. Auto Driveaway Co., supra*, 11 Cal.3d 908, 919.)" (*Glendale Federal Savings & Loan Assn. v. Marina View Heights Development Co.* (1977) 66 Cal.App.3d 101, 122.)  Based on the foregoing law, defendants' failure to move for a new trial on grounds of excessive damages forfeits their challenges to the damages award on appeal.

Nonetheless, defendants argue that they may properly raise these arguments on appeal because they objected to the damages award below.  Defendants contend they raised the issue of excessive damages in the trial court pursuant to Code of Civil Procedure sections 632, 634, and 662, such that the arguments are adequately preserved.  Not so.  The statutes cited by defendants are inapplicable here.

First, Code of Civil Procedure sections 632 and 634 delineate the procedures for requesting a statement of decision and objecting to its procedural deficiencies.  Specifically, Code of Civil Procedure section 632 authorizes a party to request a statement of decision that explains the factual and legal bases for its decision as to each of the principal controverted issues.  (Code Civ. Proc., § 632.)  Code of Civil Procedure section 634 allows a party to file objections to a statement of decision when it "does not resolve a controverted issue, or if the statement is ambiguous."  (Code Civ. Proc., § 634.)  Thus, it is irrelevant that defendants obliquely raised the trial court's damages decisions under these statutes, as the statutes are only for the purpose of requesting a statement of decision and correcting procedural omissions and ambiguities; they are not the proper avenue for a party to challenge the trial court's findings on the merits.  (See, *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 982-984 [explaining the procedure to preserve objections to statement of decision on appeal].)  Next, Code of Civil Procedure section 662, which defendants contend sets forth "precisely the procedure" that they

invoke, is also inapplicable here.  This section sets forth the "powers of [a] judge on [*a*] *motion for new trial*" following a bench trial, and explains what the judge may do "[i]n ruling on such a motion."  (Code Civ. Proc., § 662, italics added.)  As defendants did not move for a new trial, this section is of no consequence.

Defendants have failed to point to any legal authority that permits us to consider on appeal their challenges to the amount of damages awarded, nor can we discern one.  Accordingly, defendants' challenges to the damages award are not cognizable.

IV

*Statement of Decision*

Defendants next assert that we should reverse and remand for a new trial because the trial court failed to issue a sufficient statement of decision.  They argue that the final statement of decision is "riddled with legal error, such as the failure to properly apply the exhaustion doctrine and statute of limitations for FEHA claims, and the failure to properly apply California law limiting the award of damages to [ ] Hoglund to those permitted by law."  In effect, defendants are attempting to rehash the merits of their evidentiary and legal arguments, which we have already considered and rejected.  Further, defendants dedicate little analysis or explanation to their view that the statement of decision is insufficient or erroneous.  They instead reassert the objections they previously raised, and then broadly claim that the trial court failed to address the objections.  Not so.

" '[T]he trial court is not required to respond point by point to the issues posed in a request for statement of decision.  The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.'  [Citations.] . . . [The] court is not expected to make findings with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.'  [Citation.]  In addition, '[e]ven though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the

24

evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings.' " (*Thompson v. Asimos*, *supra*, 6 Cal.App.5th at p. 983.)

Here, the statement of decision properly addressed each of the issues identified in defendants' objections. They asked for the trial court to resolve whether Hoglund's claims were time-barred, whether the verdict was supported by the evidence, if Hoglund failed to mitigate damages or if her damages were otherwise limited, and if she could recover emotional distress damages. The trial court provided a factual and legal basis for each of these findings in its statement of decision. Defendants point to no actual deficiencies in the statement of decision, beyond the conclusions of fact and law with which they substantively disagree. A statement of decision is not insufficient simply because a party disagrees with the underlying findings. We accordingly reject defendants' challenge to the statement of decision.[4]

V

*Attorney Fees*

Defendants next challenge the trial court's order awarding Hoglund $958,297 in attorneys' fees. They contend Hoglund failed to provide satisfactory evidence that her attorneys' requested rates were consistent with the rates in the community, and further contend the trial court erred by awarding a multiplier. We conclude that the trial court did not abuse its discretion in making the fee award.

A. *The Trial Court's Ruling*

Following the trial, Hoglund moved for attorney fees in the amount of $1,274,828 based on the attorneys' hours expended, hourly rates, and a positive multiplier. While

---

[4]     Defendants also argue that cumulative error requires reversal of the verdict. We need not address this argument because, as explained *ante*, we do not find the trial court's decisions erroneous.

defendants conceded she was entitled to fees under FEHA, they argued that the requested fee amount was excessive, and should be, at most, $523,902. The trial court found that the hours claimed by Hoglund were reasonable and adequately proven. It also found that the hourly rates requested by Hoglund—$550 for the lead attorney, $325 for associates, and $150 for paralegals—were reasonable and supported by declarations, defendants' own expert, and further justified by the complexity of the matter. The trial court then awarded a multiplier of 1.5, based on the contingent risk associated with Hoglund's counsel's acceptance of the case, particularly because the risk was not mitigated through a partial payment by Hoglund. The court also considered, to a lesser degree, the preclusion of other employment available to Hoglund's attorneys by taking the case. The trial court reached the final amount of $958,297 by taking the lodestar of $633,061 multiplied by 1.5, plus additional fees of $8,704 for the preparation of the fee motion.

B. *Analysis*

"[A] prevailing plaintiff in a [FEHA] lawsuit is usually entitled by statute to receive an award of attorney fees." (*Caldera v. Department of Corrections & Rehabilitation* (2020) 48 Cal.App.5th 601, 606; § 12965, subd. (b).) In determining the amount of an attorney fee award under the [FEHA], courts generally use the well-established lodestar method. (*Caldera v. Department of Corrections & Rehabilitation, supra*, 48 Cal.App.5th at p. 607.) The trial court begins by calculating the lodestar figure based on the number of hours reasonably expended by counsel in the presentation of the case, multiplied by the prevailing hourly rate for private attorneys in the community conducting similar work. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131-1133 (*Ketchum*).) The lodestar figure represents the "basic fee for comparable legal services in the community." (*Id.* at p. 1132.)

Once the trial court has determined the lodestar figure, it may then increase or decrease that amount by applying a positive or negative "multiplier" to take other factors into account. (*Ketchum, supra*, 24 Cal.4th at p. 1132.) Such factors may include, but are

not limited to: (1) the novelty and difficulty of the questions involved; (2) the skill displayed in presenting them; (3) the extent to which the nature of the litigation precluded other employment by the attorneys; and (4) the contingent nature of the fee award. (*Ibid.*) The purpose of the adjustment is to "fix a fee at the fair market value for the particular action." (*Ibid.*)

Defendants first assert, without citing any legal authority, that we must review the trial court's ruling de novo because it was issued by a judge who did not preside over the trial. We are not aware of such a rule, nor do the defendants reference one. Indeed, it is well established that the determination of what constitutes reasonable attorney fees is committed to the trial court's sound discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095-1096.) An appellate court will interfere with a determination of reasonable attorney fees only if there has been a manifest abuse of discretion. (*Id.* at p. 1095.) Accordingly, we turn to defendants' arguments to determine whether any of the issues raised by defendants evince an abuse of discretion.

Defendants argue that Hoglund was required to provide evidence of the reasonable hourly rates in the Nevada County legal community (where this case was litigated and tried), and that their evidence of Sacramento hourly rates (where counsel is located) is insufficient. We disagree. While courts tend to default to the rates in the location in which the case was litigated to determine reasonableness (see *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal. App.4th 26, 72), the law does not *require* this approach. (*Ibid*.) This is because the court's determination of the relevant legal " 'market rate' . . . lie[s] within [its] broad discretion." (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 702-703.) In setting a reasonable rate, the court may consider various factors beyond the applicable legal community, such as the attorney's skill and experience, the nature of the work performed, the relevant area of expertise, and the attorney's customary billing rates. (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 632-633.) As a result, the trial court is not legally

27

confined to the four corners of the county where the case is tried to determine a reasonable rate. Indeed, our Supreme Court has upheld a fee award based on the prevailing market rate for comparable legal services "where counsel is located," as opposed to where the case was litigated. (*PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th at p. 1096.)

Here, Hoglund's requested hourly rates are supported by two attorney declarations, setting forth in detail the attorneys' experience, their prior fee awards, credentials, and the complexity and difficulty of the case. And while the lead attorney requested an hourly rate of $550, an experienced attorney familiar with the lead attorney and the case declared that $650 would be a more appropriate hourly rate than $550 based on the lead attorney's 37 years of experience and skills. Defendants' expert, in turn, opined that the $550 rate was "high," yet conceded that the rate "may be appropriate given [the attorney's] level of experience." Similarly, although defendants argue that the $325 rate is too high given the relative inexperience of the associates, defendants' expert included an audit of billing rates in Sacramento from six years prior, which reflects that $305 was a reasonable hourly rate for new associates at that time. It was therefore well within the trial court's discretion to conclude that Hoglund's requested rates were reasonable and supported by the evidence.

Defendants next argue that the 1.5 multiplier should be rejected, because the multiplier was duplicative of the high rates, and there was no permissible independent basis for the multiplier. While using a single factor to increase a lodestar and to justify a multiplier amounts to impermissible double counting (*Ketchum, supra*, 24 Cal.4th at pp. 1138-1139), the trial court here did no such thing. In fact, the trial court was careful to explicitly grant the multiplier due to the contingent nature of the case, which it did not consider when determining the reasonable base rate. A contingent risk factor alone can be sufficient to justify a fee enhancement (*Sonoma Land Trust v. Thompson* (2021) 63 Cal. App. 5th 978, 988), and here, the contingent nature of the fee agreement and

28

corresponding risk that Hoglund's counsel absorbed as a result are well documented by her declaration. Defendants have thus failed to show that the trial court's use of the multiplier was an abuse of discretion. Based on the foregoing, we affirm the award of fees.

VI

*Costs*

Defendants assert that the trial court erred by awarding costs for service of process fees and for transcripts. We are not persuaded.

They first argue that the trial court abused its discretion by permitting $2,582 for service of process fees, because their necessity and reasonableness cannot be determined, and because the fees are "duplicative." Here, Hoglund is the prevailing party, and a prevailing party may recover service of process fees. (Code Civ. Proc., § 1033.5, subd. (a)(4).) Thus, the burden is on defendants to show these costs are unnecessary or unreasonable, such that the trial court's award of these costs was an abuse of discretion. (*Los Alamito Unified School District v. Howard Contracting, Inc.* (2014) 229Cal.App.4th. 1222, 1232.) Hoglund's counsel provided a declaration that specified the date of service, the reason for service, the company used, and why the service was reasonably necessary. The trial court found that this detailed evidence of service of process fees "credibly addresses [defendants'] claims of duplicative service." Defendants simply ignore this evidence when making their argument. They have therefore given us no reason to disturb the trial court's finding.

Defendants also challenged the recovery of $10,626 for court transcripts, because the trial court did not order them, the parties agreed to split the cost, and Hoglund did not provide a receipt. Here, the trial court awarded these costs pursuant to section 12965, subdivision (c)(6), which permits additional costs beyond those identified in Code of Civil Procedure section 1033.5, at the court's discretion. Thus, unlike Code of Civil Procedure section 1033.5, subdivision (a)(9), there is no requirement that the transcripts

29

be court ordered for the costs to be recoverable.  Further, the trial court set the due dates for closing briefs based on the completion of the trial transcripts, indicating the transcripts would be reasonably necessary to their preparation.  And, Hoglund's counsel's declaration explained why they were reasonably necessary for the litigation, as they were used in both closing briefs and in the court's own statement of decision.  While defendants argue that Hoglund did not provide a receipt, they admit that they initially split the cost, and do not contend that the cost claimed by Hoglund is inaccurate.  The trial court's award of these costs was therefore not an abuse of discretion.

HOGLUND'S CROSS-APPEAL

Hoglund cross-appeals, challenging the trial court's ruling declining to award her a tax neutralization adjustment.  We conclude that Hoglund has failed to show the trial court's ruling was erroneous as a matter of law.

I

*Factual and Procedural Background*

Hoglund's economic expert, Richard Barnes, issued a report on Hoglund's economic damages before trial.  He opined that, if found liable, an appropriate award for Hoglund's past lost wages was $406,400 and for future lost wages was $457,376.  He further stated that if awarding Hoglund economic damages, the trial court should also award her a tax neutralization adjustment.  This is because, he explained, Hoglund would likely incur negative tax consequences by receiving her economic damages as a lump sum, rather than spread out over the years like a typical income.  In other words, a single large payment would move her into a higher tax bracket for the year, resulting in higher income taxes than she would have otherwise paid had she not been wrongfully terminated.  He reasoned that defendants should pay Hoglund the discrepancy to ensure she is made whole by her damages award.  Barnes cites the single published California case that has upheld a tax neutralization adjustment, *Economy v. Sutter East Bay*

30

*Hospitals* (2019) 31 Cal.App.5th 1147 (*Economy*), as legal authority for the requested offset.

As Barnes did not know the amount of economic damages the trial court would ultimately award when he drafted his report, he calculated a tax neutralization adjustment based on $800,000 in lost wages, as an "[e]xample." Using the tax rates for married individuals filing jointly in California, Barnes calculated the taxes that would be due on an $800,000 award in 2020, as compared to the taxes due if the award was spread out over nine working years, and then retirement. In sum, he opined that defendants owed Hoglund an additional $375,000 to compensate for her income tax liability from the lump sum payment. However, he noted that, "Given the wide range of possible outcomes coming from a trier of fact, the tax neutralization adjustment is frequently addressed post-trial, based on the actual award."

Barnes did not testify at trial. Hoglund dedicated a page to the tax neutralization adjustment in her closing trial brief, arguing that Barnes had provided the "foundational information" for the "methodology for determination the additional tax neutralization sums," and that an offset on this basis was appropriate to make Hoglund whole pursuant to Civil Code section 3333. She concluded, "[Hoglund] requests that the Court's determination of the tax neutralization amount be determined after liability and economic damages have been calculated and then have expert Barnes calculate the additional monies required to make the economic award tax neutral consistent with Civil Code Section 3333."

In its statement of decision, the trial court wrote simply: "The court declines to award a tax neutralization adjustment, as such claim was not supported by sufficient evidence." There is nothing in the record indicating that Hoglund objected to this finding, nor that she filed a motion or submitted a supplemental report calculating an updated amount based on the actual award.

31

## II

### *Appealability and Standard of Review*

We first address the question of appealability.  Defendants argue that Hoglund's failure to move for a new trial based on an inadequate damages award bars her ability to appeal on this issue, and that her argument is waived.  This is because, they contend, Hoglund raises a question of fact, which must be first evaluated in the trial court.  Hoglund counters that her cross-appeal presents a question of law, based on a failure of proof, which does not require an objection or new trial motion below to preserve the issue.

"A failure to timely move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive [or inadequate]." (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719.)  This is because the authority to weigh the evidence and resolve questions of credibility is vested in the trial court, not the reviewing court.  (*Schroeder v. Auto Driveaway Co., supra*, 11 Cal.3d at p. 919.)  However, "it is also established that " 'the failure to move for a new trial does not preclude a party from asserting error in the trial of damages issues–e.g., erroneous evidentiary rulings, instructional errors, or failure to apply the proper measure of damages.' [Citation]." (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 759 (*Greenwich*).)  In *Greenwich*, the appellate court held that where the issue on appeal "is not a question of *excessive* damages, but whether the evidence was sufficient to support the award [ ] in *any* amount," a new trial motion was not necessary to preserve the issue for appeal.  (*Ibid.*)  As the analysis turned on "whether substantial evidence supported the award of lost profits" and whether "the award of any lost profits was unduly speculative and uncertain as a matter of law," rather than turning on witness credibility or conflicting evidence, the court concluded that it had jurisdiction to consider the appeal.  (*Id.* at pp. 759-760.)  As in *Greenwich*, Hoglund asks us to determine whether Barnes' opinion established that a tax neutralization adjustment was unduly speculative or insufficient as a

32

matter of law. We accordingly conclude that we may properly consider this question on appeal, and address the merits.

In doing so, we note that Hoglund is faced with a "heavy, perhaps insurmountable, burden on appeal . . . ." (*Lincoln v. Lopez* (2022) 77 Cal.App.5th 922, 929; accord, *Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1067.) As the issue turns on a failure of proof, " 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support such a finding." ' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.) As we explain, Hoglund has failed to meet her burden.

### III

### *Analysis*

Several federal courts have held that the district court may award offset tax payments under statutes authorizing damage awards meant to make the aggrieved party "whole." Such "gross up" payments have specifically been granted to employees in employment discrimination cases and upheld by the federal appellate courts. (See, e.g., *Clemens v. CenturyLink* (9th Cir. 2017) 874 F.3d 1113, 1117; *Eshelman v. Agere Systems, Inc.* (3rd Cir. 2009) 554 F.3d 426, 441-442; *Sears v. Atchison, Topeka & Santa Fe Railway, Co.* (10th Cir. 1984) 749 F.2d 1451, 1456.) California caselaw on this issue, however, is sparse. Nonetheless, one California appellate court has concluded that trial courts can award gross-up damages to offset the tax consequences of lump sum awards in appropriate cases, if established with "sufficient certainty." (*Economy, supra*, 31 Cal.App.5th at pp. 1163-1164.)

In *Economy*, the trial court ordered the employer to pay its former employee an additional $650,910 as tax neutralization for his economic damages, which consisted of

33

lost past and future income. (*Economy, supra*, 31 Cal.App.5th at p. 1163.) The employer challenged the offset on the grounds that it was based on speculative assumptions about future tax rates, tax returns, and income. (*Ibid.*) The appellate court affirmed the offset. While it acknowledged that "an award to compensate for an income-tax disparity for lost future wages is inherently speculative," it saw "no reason why this factor cannot be established with sufficient certainty" as "plaintiff's expert provided 'detailed testimony regarding his calculations of (i) plaintiff's total tax liability had plaintiff not been terminated and had he continued to earn income, (ii) the amount plaintiff would have to pay in taxes if awarded the computed loss of earnings (back and front pay), and (iii) the tax neutralization amount, i.e., the amount of money needed to generate a net amount equal to the adverse tax consequence.' " (*Id.* at p. 1164.) It accordingly found it reasonable that the trial court awarded a tax neutralization amount to offset the damages to ensure the plaintiff was fully compensated for his losses. (*Ibid.*)

Here, of course, the standard of review imposes a much weightier burden on Hoglund, as the trial court did not award any tax offset due to insufficient evidence. Having reviewed Barnes' report and testimony, we cannot conclude that this evidence is " 'of such a character and weight as to leave no room for a judicial determination' " that the evidence was insufficient. (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc., supra*, 196 Cal.App.4th at p. 466.) In his 10-page damages report, Barnes dedicated five pages to the tax neutralization issue. His calculation of the appropriate offset is merely an example, and not a true calculation based on the damages award. Indeed, although Barnes suggests that he would need to provide such a precise, post-award calculation to the trial court for it to assess the proper amount, no such calculation was offered. Rather, his report sets forth only a vague "methodology" for the trial court to conduct its own calculation, without any post-award follow up. Further, the rationale behind Barnes' methodology is poorly explained. It does not discuss Hoglund's past tax returns, income, or filing status. While it assumes she will be married and filing jointly,

it also does reflect that he took her spouse's income into account. In general, it appears to be based on numerous assumptions about Hoglund's income, joint income, and applicable tax rates, yet does not explain the reasons for those assumptions. For example, the report does not explain why he assumes Hoglund has no other sources of income, such as from stock holdings or investments. Nor does it make any reasonable projections about the future. In sum, it is extremely limited and theoretical, essentially proposing a concept without applying the specific facts of this case beyond a very generic, simplistic calculation. Accordingly, we are not persuaded that Hoglund provided such clear, detailed, substantial, and unrebutted evidence that she has established her entitlement to the tax neutralization award as a matter of law. We therefore affirm the trial court's ruling denying the tax neutralization payment.

DISPOSITION

The judgment is affirmed. Hoglund shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (5).)

\s\ ,
Krause, J.

We concur:

\s\ ,
Earl, P. J.

\s\ ,
Wiseman, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.